**Roger RE, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: Jan. 12, 1988.
Decided: April 13, 1988.
Rehearing Denied May 6, 1988.

Nancy Jane Perillo (argued) and J. Dallas Winslow, Jr., Office of the Public Defender, Wilmington, for appellant.

Richard E. Fairbanks, Jr. (argued), Loren C. Meyers, and Rosemary K. Killian, Dept. of Justice, Wilmington, for State.

Before MOORE, WALSH and HOLLAND, JJ.

MOORE, Justice.

Roger Re killed his wife and appeals his convictions of Murder First Degree (11 *Del. C.* § 636 (1975)), Possession of a Deadly Weapon During the Commission of a Felony (11 *Del.C.* § 1447 (1975)), and Possession of a Destructive Weapon (11 *Del.C.* § 1444 (1975)). He was sentenced to life in prison without benefit of parole plus 40 years on the subsidiary charges. The issues in this case center on the defendant's various claims respecting his mental status or competence, both at the time of the crime and during an extended period before he finally was tried. Thus, we consider for the first time an application of *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) and *Buchanan v. Kentucky,* —— U.S. ——, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987), respecting the admissibility of certain pre-trial psychiatric evaluations of the defendant conducted by the State in the absence of defendant's counsel and without any *Miranda*[1] warnings to the defendant.

Specifically, Re assigns the following errors by the trial court: (1) the scope of defense counsel's *voir dire* of the prosecution's psychiatric expert was improperly restricted; (2) the admission into evidence of Re's malingering and anti-social personality; (3) the admission into evidence of testimony by the State's psychiatric expert relating to a 1984 competency examination during which Re was not advised of his Fifth and Sixth Amendment rights; (4) the admission of hearsay evidence that Re threatened to kill his wife and that he would thereafter feign insanity to escape prosecution; and (5) the trial court's refusal to grant a mistrial based upon allegedly improper comments by the prosecutor.

For the reasons that follow, we reject these assignments of error and affirm.

---

**1.** See *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## I.

Re shot and killed his wife, Jayne Griffin, on June 22, 1976. Their marriage had been both short and bitter.[2] On the night he killed his wife Re went to the house where she was staying and waited for her to return. Eventually, she arrived accompanied by an off-duty police officer as her date. Re confronted the couple inside the house. An argument ensued, which ended when Re shot his wife five times with a .38 caliber revolver and once with a sawed-off shotgun.

Re's mental state became an issue from the time of his arrest. He claimed amnesia, and allegedly was unable to communicate with his court appointed counsel. Despite these circumstances, the court twice found Re competent to stand trial.[3] After the second competency hearing Re's lawyer filed a notice of intention to plead the defense of insanity, and at a third hearing in October, 1979, Re was found incompetent to stand trial.

Between 1979 and 1984 Re was examined several times for competency purposes, but on each occasion the court found that he was unable to defend himself because of his non-communicative behavior. Finally, in late 1984 the State retained Dr. Park Dietz, a forensic psychiatrist who had experience in identifying malingerers, i.e. those who voluntarily produce physical or psychological symptoms to attain a specific goal such as the evasion of prosecution.[4] Based upon discussions with Re and upon an expansive investigation of Re's life and family, Dr. Dietz concluded that Re did not suffer from any mental illness and was a malingerer. Relying upon Dr. Dietz's testimony at a final competency hearing in April, 1985, the trial court found Re mentally competent to stand trial.

In addition to testifying at the competency hearing, Dr. Dietz appeared at trial on behalf of the State to rebut Re's defense that he was under "extreme emotional distress" at the time of the murder. Prior to this testimony, the judge permitted defense counsel a *voir dire* examination of Dr. Dietz, but limited it to questions regarding the bases of Dr. Dietz's conclusions. Dr. Dietz was allowed to testify that Re was, in his opinion, a malingerer, and that Re had an anti-social personality disorder. Furthermore, Dr. Dietz was permitted to testify to facts obtained during his examination of Re in November, 1984. Re was not advised of his rights prior to that interview and he now challenges the admission of such testimony.

Re also contends that the testimony of Danielle Stoner was improperly admitted. The latter testified that one and one-half weeks before Griffin's death she told Stoner that Re said: "Don't leave me because if you do, I'll kill you". When Griffin suggested he would go to jail, Re said that he would pretend he was crazy. Re objects to this testimony as hearsay.

Finally, Re challenges several statements made by the prosecutor during his closing argument.

## II.

### A. *Defendant's voir dire of Dr. Dietz.*

Under Delaware law, an expert must identify the underlying bases for an opinion before actually stating the opinion. To enforce this concept Delaware Rule of Evidence 705(b), grants a trial judge discretion to allow an adverse party, upon that party's motion, to conduct a limited *voir dire*

---

**2.** Griffin filed charges against Re twice in their short marriage, once for offensive touching, and once for offensive touching and terroristic threatening. Griffin and Re were ordered to have no contact with each other, but apparently both parties violated this order.

**3.** Re was found competent after hearings on February 24, 1977 and May 31, 1978. Dr. Galliani of the Delaware State Hospital testified at these times that Re was suffering from no men-

tal illness which would prevent him from adequately defending himself.

**4.** Dr. Dietz was retained in connection with an investigation into Re's activities at the Delaware State Hospital. Apparently, Re was granted several unusual and extraordinary privileges based upon his manipulation of certain hospital employees, while at the same time he purported to be unresponsive to his doctors and attorneys.

of the expert.[5] D.R.E. 705(b) (1987). *See also Fensterer v. State,* Del.Supr., 509 A.2d 1106 (1986). As the official comment to Rule 705(b) indicates, this examination should be "limited to establishing that there is sufficient evidence to permit the expert to express an opinion. Moreover, the comment observes that "Care must be taken to avoid having the jury hear the ultimate opinion at the time of voir dire." D.R.E. 705(b) (Comment).

■ Re now claims that the trial court's limitation of voir dire to the bases of Dr. Dietz's opinion, rather than the opinion itself, was error. Re argues that his counsel was unable to defend him properly since he could not ascertain Dr. Dietz's opinion regarding the defense of extreme emotional distress. This claim is groundless. Under a plain reading of Rule 705(b), and its comments, the trial judge must limit voir dire to questions regarding the bases of, and not the substance of, the expert's opinion. If anything, this is more liberal than either the Federal or Uniform Rules of Evidence. As the Delaware commentary notes in pertinent part:

> The Committee believed that F.R.E. 705 adopts an improper approach in that it would permit an expert witness to testify without first establishing the facts and data upon which he bases his opinion. Rule 705 as revised by the Committee normally requires an expert witness to first establish what his opinion is based upon. The judge, in his discretion, may permit voir dire examination in the presence of or out of the presence of the jury to ascertain if there are sufficient under-

lying facts or data in the record to permit the expert to testify as to his opinion.

\* \* \* \* \* \*

> The Committee believed that it is usually preferable to have an expert establish the factual basis of his testimony prior to his giving his opinion rather than leaving it to be elicited by cross-examination.

D.R.E. 705 (Comment).

However, the purpose of Dr. Dietz's testimony was not to render an opinion on the defense of extreme emotional distress. The State used him as a rebuttal witness to discredit the testimony of the defense experts. In fact, Dr. Dietz testified on voir dire that he had no opinion regarding the defense of extreme emotional distress, since it is a legal rather than medical concept. Clearly, there was no error in the conduct of this *voir dire* examination.

### B. *The Evidence of Malingering and Anti-Social Personality.*

Re objects to Dr. Dietz's testimony that Re was malingering and that he had an anti-social personality disorder. Re argues that this testimony was prejudicial and should have been excluded because it was irrelevant and/or because it was evidence of Re's credibility.

■ Evidence is relevant if it tends to make more or less probable a fact important to the outcome of a case. D.R.E. 401. The decision as to relevance is vested in the discretion of the trial judge. *Lampkins v. State,* Del.Supr., 465 A.2d 785, 790 (1983). When an expert relies upon the oral representations of another person to reach his conclusion, the jury must determine the

---

**5.** While the Delaware Rules of Evidence generally are based on the Federal Rules of Evidence, there are some notable exceptions. Thus, D.R. E. 705(a), although based on F.R.E. 705, is substantially different. D.R.E. 705(b) is new and is not contained in F.R.E. 705 or U.R.E. 705. D.R. E. 705 provides:

> RULE 705. DISCLOSURE OF FACTS OR DATA UNDERLYING EXPERT OPINION.
> (a) *Disclosure of Facts or Data Underlying Expert Opinion.* The expert may testify in terms of opinion or inference, provided he first identifies the facts and data upon which

he bases his opinion and his reasons for the opinion, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.
> (b) *Objection.* An adverse party may object to the testimony of an expert on the ground that he does not have a sufficient basis for expressing an opinion. He may, before the witness gives his opinion, be allowed to conduct a voir dire examination directed to the underlying facts or data on which the opinion is based.

credibility of both the expert and the person upon whom he relied. *Debernard v. Reed,* Del.Supr., 277 A.2d 684, 685 (1971). Thus, evidence bearing upon the truthfulness of the third party's representations clearly is relevant.

■ Re's defense heavily relied upon the expert testimony by Drs. Galliani and Weintraub that he was suffering from "extreme emotional distress" at the time of the murder of Jayne Griffin. Such testimony was based almost exclusively on the experts' conversations with Re after the incident. The State then presented Dr. Dietz to show that Re was feigning mental illness. The logical result of Dr. Dietz's conclusion is that anything Re said during the interviews with Drs. Galliani and Weintraub was not credible. The testimony of Dr. Dietz tended to make less probable the truthfulness of Re's statements to his expert witnesses. Under the circumstances, it clearly was relevant.

■ Although an expert may not, generally, testify regarding the credibility of a defendant, *Wheat v. State,* Del.Supr., 527 A.2d 269, 274–75 (1987); *Powell v. State,* Del.Supr., 527 A.2d 276, 279–80 (1987), the court may allow such testimony if it is used to illustrate the unreliability of the defendant's statements when they are being offered as a basis for an expert opinion. When an expert relies on the statements of another person in formulating an opinion, that person's credibility is at issue. *Debernard v. Reed,* Del.Supr., 277 A.2d 684, 685 (1971). *See Fensterer v. State,* Del.Supr., 509 A.2d 1106, 1109 (1986) (establishing basis for expert opinion is prerequisite to admission).[6] In judging the credibility of the speaker, the jury should have the benefit of any information which might illuminate the speaker's propensity for truthfulness or the lack of it. Although the issue of credibility of an expert witness, or of a person who makes statements upon which that expert relies, is ultimately for the jury, an adverse party should not be precluded from impeaching either the testimony of

the expert or the foundation of that testimony.

## C. Fifth and Sixth Amendment Claims.

### 1. Supreme Court Precedent.

The defendant argues that Dr. Dietz's testimony, recounting the November, 1984 interview with Re, violated his rights under the Fifth and Sixth Amendments to the United States Constitution, since the interview was conducted without advising Re of his *Miranda* rights or of his right to counsel.

The United States Supreme Court has previously considered the use of evidence obtained through psychological examinations and its relation to the Fifth and Sixth Amendments. In *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Court reversed the conviction of a defendant who was subjected to a court-ordered pre-trial psychological examination without being advised of his Fifth and Sixth Amendment rights. The results of that examination had been used against the defendant in sentencing him to death.

The Court found that the State violated the defendant's Fifth Amendment right, because he was not given Miranda warnings, and his statements about the underlying crime were used against him at sentencing. The Court noted that the pre-trial examination was, under the circumstances, more than "a routine competency examination restricted to ensuring that respondent understood the charges against him and was capable of assisting in his defense." *Smith,* 451 U.S. at 465, 101 S.Ct. at 1874. However, the Court was careful to limit its holding in *Smith* to the "distinct circumstances" of that case, *Id.* at 466, 101 S.Ct. at 1875, and acknowledged that the State should be allowed under other circumstances to use psychiatric evidence to rebut a defendant's psychiatric claim:

"When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may de-

---

**6.** See also *McCloskey v. State,* Del.Supr., 457 A.2d 332, 337 (1983) where this Court held that evidence which is not generally admissible may

be used to impeach an expert upon cross-examination.

prive the ˜State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution psychiatrist."

*Id.* at 465, 101 S.Ct. at 1874. Finally, the Court stated that as a general rule: "A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id.* at 468, 101 S.Ct. at 1876.

Because Smith's appointed counsel had not been informed of the psychiatric examination or its scope, the Court also found a violation of Smith's Sixth Amendment right to counsel. Although it was unclear whether Smith's counsel had received notice of the examination, counsel was nevertheless unaware of the scope of the examination or the uses to which the information obtained might be put. Thus, the Court held, the defendant had no opportunity to effectively discuss the examination with his attorney.

Recently, the Supreme Court reexamined *Estelle v. Smith* in *Buchanan v. Kentucky,* — U.S. —, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). The Court held that the conviction of a defendant whose pre-trial psychiatric evaluation was used at trial to rebut the defendant's "mental status" defense did not violate the defendant's Fifth and Sixth Amendment rights. Unlike *Smith,* the psychological examination was performed at the request of both the prosecution and the defense. It later was used at trial to rebut evidence which the defendant introduced to support a claim of "extreme emotional disturbance". The defendant did not take the stand, leaving the prosecution unable to respond to the defense except by introducing evidence of the pre-trial examination. The Court, relying on *Estelle v. Smith,* held that a defendant who "requests an evaluation or presents psychiatric evidence" is subject to the reality that the prosecutor may rebut his pre-

sentation with evidence from the requested examination. 107 S.Ct. 2917–18. The prosecution did not violate Buchanan's Fifth Amendment right because the psychiatric report was used for the narrow purpose of rebutting the mental status defense, and because the report did not describe any statements dealing with the crime for which Buchanan was charged. *Id.* at 2918. The Court also held that Buchanan's Sixth Amendment right was not violated because the defendant's counsel had requested the examination, and therefore, presumably had the opportunity to discuss the examination and its scope with his client.

The Fifth Circuit recently characterized the *Buchanan* holding in terms of a waiver of the Fifth and Sixth Amendment rights. In *Schneider v. Lynaugh,* 835 F.2d 570, No. 86–1495 (5th Cir.1988) the defendant proffered the testimony of counselors and chaplains that he was capable of rehabilitation. The court found that this testimony was sufficient to put Schneider's mental state at issue, and that *Buchanan* should therefore apply. In interpreting *Buchanan* the court identified two policy reasons behind the holding of that case: (1) the rule promotes a fair state-individual balance; and (2) the rule prevents fraudulent mental defenses. *Schneider,* At 575. The court characterized the introduction of mental status evidence as a waiver of both the Fifth and Sixth Amendment rights:

> In *Williams v. Lynaugh* [809 F.2d 1063], we treated both Fifth and Sixth Amendment objections as waived when the prosecution's psychiatric evidence was properly limited to rebuttal of the defendant's mental status evidence. Nothing in *Buchanan* undercuts this treatment. Schneider cannot complain of the mere fact that the examination extended beyond the subject of competency. He can only object to the use of that broadened examination against him; and he is held, as a matter of policy if not of "knowing and intelligent" waiver, to have invited that use of introducing mental status testimony of his own. If maintenance of a "fair state-individual balance" requires this conclusion under the Fifth Amend-

ment, Schneider may not circumvent this policy through the Sixth Amendment. *Id.,* At 578.

Under *Smith* and *Buchanan,* then, a defendant who either initiates a psychiatric examination *or* attempts to introduce psychiatric evidence may not challenge on either Fifth or Sixth Amendment grounds the prosecution's use of psychiatric evidence in rebuttal.

2. Application of *Smith* and *Buchanan.*

█ Although Re did not request the examination by Dr. Dietz, he specifically placed his mental status at issue. He was first examined just days after the killing pursuant to an order of the trial court. Thereafter, Re was examined several times by Dr. Galliani of the Delaware State Hospital regarding his competence to stand trial. Re was twice found competent primarily due to Dr. Galliani's testimony. After the second competency hearing, on June 16, 1978, Re declared his intention to plead insanity. This was an affirmative step by Re and his attorney to raise the issue of the defendant's mental status.

Later, Re was found incompetent after several more examinations by Dr. Galliani and others. The trial court continued to hold competency hearings intermittently, and finally, in 1984, the Attorney General ordered a complete investigation of Re and his activities, including his extraordinary privileges, at the State Hospital. The State secured the services of Dr. Dietz, who concluded that Re was malingering, and he so testified at the final competency hearing in 1985. Dr. Dietz's examination was conducted solely for the purpose of determining Re's mental status. He did not speak to Re about the crime, and asked only general questions designed to determine if Re was actually insane. Even when Re was found competent, based upon Dr. Dietz's testimony, the defendant continued to assert a "mental status" defense of "extreme emotional distress." Thus, that issue has been in the forefront of this case since the day that Re was arrested.

The defendant's argument that the State may not use Dr. Dietz's examination against him, because Re did not initiate the interview, ignores half of the *Smith/Buchanan* test. In *Smith* the court held: "A criminal defendant, who neither initiates a psychiatric examination *nor attempts to introduce any* psychiatric evidence, may not be compelled to respond to a psychiatrist. . . ." 451 U.S. at 468 (emphasis added). Similarly in *Buchanan* the court held: "if a defendant requests such an evaluation *or presents psychiatric evidence,* then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested." 107 S.Ct. at 2918 (emphasis added). Both by malingering and asserting the mental status defenses of insanity and extreme emotional distress, Re subjected himself to the possibility that the prosecution would examine him and use the results of the examination to rebut his defenses. Re initiated the psychiatric examinations by his actions, and cannot be heard to challenge the use to which they were put in this case.

The prosecution properly used the testimony of Dr. Dietz for rebuttal purposes. The scope of Dr. Dietz's examination had been limited to determining Re's mental status. Thus, the examination was the "routine competency examination" mentioned in *Smith.* 451 U.S. at 465, 101 S.Ct. at 1874. At trial, Dr. Dietz testified only to his observations of Re's behavior and not to any statements Re may have made about the crime. (In fact Re claimed to remember nothing of the crime.) Therefore, when Re presented psychiatric evidence on his own behalf, the prosecution properly limited the use of its own psychiatric evidence to rebuttal. No Fifth Amendment right to silence was violated here.

█ Re attempts to distinguish this case from *Buchanan* because he, unlike Buchanan, testified in his own defense. In *Buchanan,* the court, relying on *Estelle,* found that the prosecution was unable to challenge Buchanan's mental status defense, except by using the pre-trial psychiatric examination, because Buchanan did not take the witness stand. We do not

believe that a defendant may escape the holding of *Smith* and *Buchanan* simply by testifying at trial. Here, the State was powerless to challenge Re's defense without the introduction of the evidence obtained in Dr. Dietz's November 1984 examination. Although Re took the stand in his own behalf, he claims to have forgotten everything from the time just before the killing until only days before trial. Thus, Re was silent about the only period relevant to the success or failure of his defense. This deprived "the State of the only effective means it [had] of controverting [the defendant's] proof on an issue that he interjected into the case." *Smith*, 451 U.S. at 465, 101 S.Ct. at 1874.

■ Re's Sixth Amendment rights also were not violated. Although Re's attorney did not initiate the psychiatric examination, he was aware that Re was under investigation by the Attorney General's Office at the time of Dr. Dietz's examination. It is unclear whether Re's attorney had actual notice of Dr. Dietz's examination, but having asserted a mental status defense all along, he should have expected that Re would be examined periodically. Had Re's attorney had actual notice, it is unlikely that he could have discussed the examination or its scope in any intelligent fashion with Re, since Re was wholly non-communicative at that time. To the extent possible, Re's attorney had the opportunity to advise Re that he would be examined in connection with his mental status.[7] More importantly Re's attorney was on notice that by asserting a mental status defense, the defendant would face the use of psychological evidence by the prosecution in rebuttal. *Buchanan*, 107 S.Ct. 2919. Given these facts, Re waived his Sixth Amendment rights by putting his mental status at issue. *Schneider v. Lynaugh*, At 578.

### III.

■ The State called Danielle Stoner at trial to testify to statements which the victim, Jayne Griffin, made to her one and one-half weeks before the latter's death. According to Stoner, Griffin told her that Re had threatened to kill Griffin, and that Re proclaimed "that he would just act like he was crazy and get off." Re challenges this statement as hearsay.

Hearsay, under D.R.E. 801(c) is a statement made outside of trial which is "offered in evidence to prove the truth of what it asserts."[8] Re's statement to his wife was not offered to prove that he would kill her, or that he would feign insanity. Rather, the statement was offered to rebut Re's claim that he killed his wife due to extreme emotional distress.

Griffin's statement to Stoner, relating what Re had told her, while technically hearsay, is admissible under D.R.E. 803(3) as one of the exceptions to D.R.E. 802.[9] That exception allows for the admission of statements which reflect the state of mind of the speaker at the time of the statement. Griffin's statement to Stoner demonstrates Griffin's fear that Re would kill her. This fear is contrary to Re's position that Griffin incited stress in him which ultimately led him to kill her. Thus, Griffin's state of mind was relevant, and the trial judge properly admitted the statements.

### IV.

We have considered Re's allegations of prosecutorial misconduct during closing arguments. Examining these comments under the principles of *Brokenbrough v. State*, Del.Supr., 522 A.2d 851 (1987), *Hughes v. State*, Del.Supr., 437 A.2d 559 (1981) and *Hooks v. State*, Del.Supr., 416 A.2d 189 (1980), we conclude that none of them rise to the level of reversible error. While at times the prosecutor's remarks may have approached the limits of propriety, given the overwhelming evidence of the defendant's guilt we do not find that such

---

**7.** Regardless of whether Re's attorney knew in advance of Dr. Dietz's initial examination of Re *in* November 1984, we find it significant that he had knowledge of the examination after-the-fact, yet still consented to a second pre-trial examination by Dr. Dietz in May 1985.

**8.** This completely follows F.R.E. 801(c).

**9.** D.R.E. 803(3) follows F.R.E. 803(3), and D.R.E. 802 follows U.R.E. 802.

remarks constitute reversible error in this case.

AFFIRMED.