Joseph **SIEGMAN**, as custodian for Gregory Siegman and Michelle Siegman, Plaintiff,

v.

**COLUMBIA PICTURES ENTERTAINMENT, INC.**, a Delaware corporation; Sony Columbia Acquisition Corp., a Delaware corporation; and Sony USA Inc., a New York corporation, Defendants.

Civ. A. No. 11152.

Court of Chancery of Delaware, New Castle County.

Submitted: Oct. 26, 1989.
Decided: Oct. 31, 1989.
Revised: Nov. 9, 1989.

---

William Prickett, Michael Hanrahan, Elizabeth M. McGeever, and Chandlee Johnson Kuhn, Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, and Arthur T. Susman, and Terry R. Saunders, Susman, Saunders & Buehler, Chicago, Ill., for plaintiff.

James F. Burnett, and Donald J. Wolfe, Jr., Potter Anderson & Corroon, Wilmington, and Marc P. Cherno, and Debra M. Torres, Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendant Columbia Pictures Entertainment, Inc.

Rodman Ward, Jr., and Anthony W. Clark, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Richard L. Brusca, and Janet L. Goetz, Skadden, Arps, Slate, Meagher & Flom, Washington, D.C., for defendants Sony Columbia Acquisition Corp. and Sony USA Inc.

## OPINION

HARNETT, Vice Chancellor.

Plaintiff's motion for a preliminary injunction must be denied because he has not shown a reasonable probability that any violation of 8 *Del.C.* § 203, the Delaware Takeover Statute, has occurred as a result of the Tender Offer of Sony USA Inc. ("Sony") for all of the shares of Columbia Pictures Entertainment, Inc. ("Columbia").

Although I find that plaintiff has shown a reasonable probability that Sony became an "interested stockholder" of Columbia on September 27, 1987, as that term is defined in the Statute, I also find that earlier on that same day the Board of Columbia approved the takeover and therefore the three-year limitation on certain mergers imposed by 8 *Del.C.* § 203 does not apply.

### I

The very short time available to consider the claim of plaintiff that the provisions of 8 *Del.C.* § 203 prohibit the consummation of the proposed merger later today does not allow an extended discussion of all the factual background and contentions of the parties, but the essential facts are not disputed.

The plaintiff, Joseph Siegman, is the owner of shares of stock of Columbia Pictures Entertainment, Inc. ("Columbia"). The defendants are two Delaware corporations: Columbia and Sony Columbia Acquisition Corp. ("Sony Acquisition Corp."), and

one New York corporation, Sony USA Inc. ("Sony"). The plaintiff purportedly brings this action on behalf of himself and on behalf of a class consisting of the stockholders of Columbia who are similarly situated.

This action arises out of an Agreement and Plan of Merger ("Merger Agreement") executed by Columbia, Sony and Sony Acquisition Corp. on September 27, 1989. On October 3, 1989, pursuant to the Merger Agreement, Sony Acquisition Corp., a wholly-owned subsidiary of Sony, commenced a Tender Offer for all of Columbia's common shares of stock at $27 per share. The offered price allegedly represents a 135% premium over the market price of Columbia's stock as it existed at the beginning of 1989. The Tender Offer, which is currently set to expire on October 31, 1989, will immediately be followed by a $27 per share merger freezing out any Columbia stockholders who do not tender.

The Board of Directors of Columbia approved and executed the Merger Agreement with Sony and Sony Acquisition Corp. on the morning of September 27, 1989. Several hours later, on the same day, Sony and the Coca–Cola Company ("Coca–Cola") entered into an Option Agreement whereby Sony would acquire the common and preferred shares of Columbia owned by Coca–Cola. Coca–Cola owned approximately 49% of Columbia's outstanding stock. The Option Agreement, however, was expressly conditioned upon its being approved by the Board of Directors of Coca–Cola, which would not meet until October 2, 1989. The senior management of Coca–Cola was obligated to recommend the approval of the Option Agreement to the Coca–Cola directors.

The plaintiff seeks to preliminarily enjoin the proposed business combination. He claims that the Tender Offer and proposed Merger violate the Delaware Takeover Statute, 8 *Del.C.* § 203, which, in essence, prohibits for three years a takeover of a Delaware corporation by an "interested stockholder" (as defined in the statute) unless the transaction is excepted from the limitations of the act. The two exceptions

pertinent to the present controversy are: (1) the proposed takeover receives timely prior approval by the board of the target corporation; or (2) it is subsequently approved by the board of the target and by a two-thirds vote of the target's stockholders other than the "interested stockholder." An "interested stockholder" is essentially an entity that controls or owns more than 15% of the voting stock of a target corporation. Plaintiff asserts that Sony became an "interested stockholder" in Columbia on September 27, 1989 when the Option Agreement was executed, despite the alleged conditional nature of the Option. Consequently, the plaintiff claims that the Board of Columbia did not timely approve the takeover so as to exempt the transaction from the takeover statute because it did not comply with the provisions of 8 *Del. C.* § 203(a)(1) which require that a target board approve the business combination "prior to such date" a tender offeror becomes an "interested stockholder." If 8 *Del. C.* § 203(a)(1) does not apply, the proposed business combination cannot be completed for three years, unless it is also approved "at an annual or special meeting of stockholders [of Columbia] ..., by the affirmative vote of at least 66⅔% of the outstanding voting stock which is not owned by the interested stockholder." 8 *Del.C.* § 203(a)(3).

The defendants, however, assert that the proposed business combination is not subject to the three-year prohibition of the statute for two reasons. First, the defendants argue that Sony did not become an "interested stockholder" of Columbia until the Option Agreement was approved by the Board of Coca–Cola on October 2, 1989, even though it was signed on September 27th. Consequently, the defendants argue that the exception provided by 8 *Del. C.* § 203(a)(1) applies because the September 27th Merger Agreement was approved and executed by the Board of Columbia prior to October 2nd, the day on which defendants claim that Sony became an "interested stockholder" of Columbia.

In the alternative, the defendants assert that even if Sony became an "interested stockholder" of Columbia on September

27th, the day the Option Agreement was executed by Sony and Coca-Cola, the exception provided by 8 *Del. C.* § 203(a)(1) still applies because the Merger Agreement was approved by the Board of Columbia on September 27th prior to the "time" that the Option Agreement was executed.

As will be discussed, I find that the plaintiff has shown a reasonable probability that Sony became an "interested stockholder" in Columbia on September 27th. Nevertheless, as a matter of law, the transaction is not subject to the three-year prohibition against a business combination because 8 *Del. C.* § 203(a)(1) permitted the Board of Columbia to approve the transaction on September 27th, as long as the approval preceded the time Sony became an "interested stockholder" on that day. In reaching this conclusion I determine that the term "date" as used in 8 *Del. C.* § 203(a) is ambiguous and, therefore, it is necessary to construe the statute to ascertain the intent of the General Assembly as to its meaning. An examination of the legislative history of the statute shows that the word "date" as used in 8 *Del. C.* § 203(a)(1) should be construed, consistent with the legislative intent, to mean "time." 8 *Del. C.* § 203(a)(1), therefore, exempts the proposed business combination from the provisions of 8 *Del. C.* § 203 because the Board of Columbia approved the transaction with Sony prior to the "time" that Sony became an "interested stockholder."

## II

8 *Del.C.* § 203 in pertinent parts states:

### § 203. Business combinations with interested stock holders.

(a) Notwithstanding any other provisions of this chapter, a corporation shall not engage in any business combination with any interested stockholder for a period of *3 years following the date that such stockholder became an interested stockholder,* unless:

(1) *Prior to such date* the board of directors of the corporation approved either the business combination or the transaction which resulted in the stock-holder becoming an interested stockholder;

\*　　\*　　\*　　\*　　\*　　\*

(3) *On or subsequent to such date* the business combination is approved by the board of directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66⅔% of the outstanding voting stock which is not owned by the interested stockholder.

\*　　\*　　\*　　\*　　\*　　\*

(c) *As used in this section only, the term:*

\*　　\*　　\*　　\*　　\*　　\*

(3) *"Business combination"*, when used in reference to any corporation and any interested stockholder of such corporation, means:

(i) Any merger or consolidation of the corporation with (A) the interested stockholder, or (B) with any other corporation if the merger or consolidation is caused by the interested stockholder and as a result of such merger or consolidation subsection (a) of this section is not applicable to the surviving corporation;

\*　　\*　　\*　　\*　　\*　　\*

(iii) Any transaction which results in the issuance or transfer by the corporation or by any direct or indirect majority-owned subsidiary of the corporation of any stock of the corporation or of such subsidiary to the interested stockholder, except: (A) Pursuant to the exercise, exchange or conversion of securities exercisable for, exchangeable for or convertible into stock of such corporation or any such subsidiary which securities were outstanding *prior to the time that the interested stockholder became such;* (B) pursuant to a dividend or distribution paid or made, or the exercise, exchange or conversion of securities exercisable for, exchangeable for or convertible into stock of such corporation or any such subsidiary which security is distributed, pro rata to all holders of a class or series of stock of such corporation *subsequent to the time the interested stockholder became such;* (C) pursuant to an ex-

change offer by the corporation to purchase stock made on the same terms to all holders of said stock; or (D) any issuance or transfer of stock by the corporation; provided however, that in no case under items (B)–(D) of this subparagraph shall there be an increase in the interested stockholder's proportionate share of the stock of any class or series of the corporation or of the voting stock of the corporation;

(iv) Any transaction involving the corporation or any direct or indirect majority-owned subsidiary of the corporation which has the effect, directly or indirectly, of increasing the proportionate share of the stock of any class or series, or securities convertible into the stock of any class or series, of the corporation or of any such subsidiary which is owned by the interested stockholder, except as a result of immaterial changes due to fractional share adjustments or as a result of any purchase or redemption of any shares of stock not caused, directly or indirectly, by the interested stockholder; or

\* \* \* \* \* \*

(5) "Interested stockholder" means any person (other than the corporation and any direct or indirect majority-owned subsidiary of the corporation) that (i) is the owner of 15% or more of the outstanding voting stock of the corporation, or (ii) is an affiliate or associate of the corporation and was the owner of 15% or more of the outstanding voting stock of the corporation *at any time* within the 3–year period immediately *prior to the date* on which it is sought to be determined whether such person is an interested stockholder, and the affiliates and associates of such person; provided, however, that the term "interested stockholder" shall not include (x) any person who (A) owned shares in excess of the 15% limitation set forth herein as of, or acquired such shares pursuant to a tender offer commenced prior to, December 23, 1987, or pursuant to an exchange offer announced *prior to the aforesaid date* and commenced within 90 days thereafter and continued to own shares in excess of such 15% limitation or would have but for action by the corporation

\* \* \* \* \* \*

(8) "Owner," including the terms "own" and "owned," when used with respect to any stock, means a person that individually or with or through any of its affiliates or associates:

(i) Beneficially owns such stock, directly or indirectly; _or_

(ii) Has (A) the *right to acquire such stock (whether such right is exercisable immediately or only after the passage of time)* pursuant to any *agreement, arrangement or understanding, or upon the exercise of* conversion rights, exchange rights, warrants or *options, or otherwise;* provided, however, that a person shall not be deemed the owner of stock tendered pursuant to a tender or exchange offer made by such person or any of such person's affiliates or associates until such tendered stock is accepted for purchase or exchange; or (B) *the right to vote such stock pursuant to any agreement, arrangement or understanding;* provided, however, that a person shall not be deemed the owner of any stock because of such person's right to vote such stock if the agreement, arrangement or understanding to vote such stock arises solely from a revocable proxy or consent given in response to a proxy or consent solicitation made to 10 or more persons; _or_

(iii) Has *any agreement, arrangement or understanding for the purpose of acquiring, holding, voting* (except voting pursuant to a revocable proxy or consent as described in item (B) of subparagraph (ii) of this paragraph), *or disposing of such stock* with any other person that beneficially owns, or whose affiliates or associates beneficially own, directly or indirectly, such stock. (emphasis added)

### III

The standards for the issuance of a preliminary injunction are well-established. In *Allen v. Prime Computer, Inc.,* Del.Supr.,

540 A.2d 417, 419 (1988), the Supreme Court of Delaware held:

> To obtain a preliminary injunction the plaintiff must demonstrate a reasonable probability of success on the merits and that irreparable harm will occur absent the injunction. Additionally, the plaintiff must show that the harm it would suffer absent an injunction outweighs the harm to the defendant if relief is granted. *Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334, 1341 (1987); *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173, 179 (1986); *Gimbel v. Signal Companies, Inc.*, Del. Ch., 316 A.2d 599, 602, *aff'd.*, Del.Supr., 316 A.2d 619 (1974).

## IV

■ The first issue to be addressed is whether the plaintiff has shown a reasonable probability that the Option Agreement executed by Sony and Coca–Cola on September 27, 1989, made Sony an "interested stockholder" in Columbia on that day. The plaintiff claims that the Option Agreement rendered Sony an "interested stockholder" on September 27th because the Option Agreement, whether finally binding or not, is an "agreement, arrangement or understanding" pursuant to 8 *Del. C.* § 203(c)(8)(ii) or 203(c)(8)(iii).

The defendants, however, contend that the Option Agreement is not the type of "agreement, arrangement or understanding" that the statute is intended to encompass, because the statute is limited to vested rights and was only intended to cover situations where the parties have formed an intention to be finally bound. The defendants assert that Sony was not an "interested stockholder" of Columbia as of September 27th because the Option Agreement stated that it would not be binding until approved by the Board of Coca–Cola on October 2nd and, therefore, on September 27th Sony had no vested right to purchase the 49% interest in Columbia owned by Coca–Cola. If Sony did not become an "interested stockholder" by becoming an "owner" (as that term is de-

fined) of 15% or more of Columbia's stock, until October 2nd, the approval of the takeover by the Board of Columbia on September 27th was timely as a matter of law.

Under 8 *Del. C.* § 203(c)(5), an "interested stockholder" means:

> any person (other than the corporation and any direct or indirect majority-owned subsidiary of the corporation) that (i) *is the owner of 15% or more of the outstanding voting stock of the corporation,* ... (emphasis added).

The term "owner" is defined in Section 203(c)(8):

> "Owner," including the terms "own" and "owned," when used with respect to any stock, means a person that individually or with or through any of its affiliates or associates:
>
> (i) Beneficially owns such stock, directly or indirectly; *or*
>
> (ii) Has (A) the *right to acquire such stock (whether such right is exercisable immediately or only after the passage of time)* pursuant to any *agreement, arrangement or understanding, or upon the exercise of* conversion rights, exchange rights, warrants or *options, or otherwise;* provided, however, that a person shall not be deemed the owner of stock tendered pursuant to a tender or exchange offer made by such person or any of such person's affiliates or associates until such tendered stock is accepted for purchase or exchange; or (B) *the right to vote such stock pursuant to any agreement, arrangement or understanding;* provided, however, that a person shall not be deemed the owner of any stock because of such person's right to vote such stock if the agreement, arrangement or understanding to vote such stock arises solely from a revocable proxy or consent given in response to a proxy or consent solicitation made to 10 or more persons; *or*
>
> (iii) Has *any agreement, arrangement or understanding for the purpose of acquiring, holding, voting* (except voting pursuant to a revocable proxy or consent as described in item (B) of subparagraph (ii) of this paragraph), *or dis-*

*posing of such stock* with any other person that beneficially owns, or whose affiliates or associates beneficially own, directly or indirectly, such stock. (emphasis added)

Several portions of the Option Agreement facially indicate that it was not to be binding unless approved by the Coca–Cola Board on October 2nd. Paragraph 2.2 provides, in pertinent part:

This Agreement has been duly and validly executed and delivered by [Coca–Cola] *subject to approval or ratification of this Agreement by the Board* of Directors of [Coca–Cola] at a meeting to be held on Monday, October 2, 1989 and *upon approval or ratification of this Agreement* by the Board of Directors of [Coca–Cola] *will constitute a valid and binding agreement* of [Coca–Cola], enforceable against [Coca–Cola] in accordance with its terms. (emphasis added)

The applicable portion of Paragraph 6.13 of the Option Agreement states:

Notwithstanding any provision hereof to the contrary this Agreement shall be effective as to the obligations of [Coca–Cola] hereunder upon approval or ratification the Board of Directors of [Coca–Cola] of this Agreement at a meeting which [Coca–Cola] shall hold on Monday, October 2, 1989 and, *if this Agreement shall not be so approved or ratified, this Agreement and the obligations of the parties hereunder shall terminate and be of no further force and effect without liability of one party to the other hereunder.* (emphasis added)

The definitions of "interested stockholder" and "owner" in 8 *Del. C.* § 203(c) are very broad. See D. DREXLER, L. BLACK, A. SPARKS, *Delaware Corporation Law and Practice* § 23.02[2], at 23–8 (1989).

Significantly, the definition of "owner" in 8 *Del. C.* § 203(c)(8) not only includes circumstances where there is a right to acquire or right to vote shares pursuant to an "agreement, arrangement or understanding" (see 8 *Del. C.* § 203[c][8][ii] ), but also encompasses situations where there is *"any agreement, arrangement* or *under-*

*standing for the purpose of* acquiring, holding, voting, ... or disposing of such stock." (8 *Del. C.* § 203[c][8][iii] ) (emphasis added). Unfortunately, 8 *Del. C.* § 203 does not provide a definition of "agreement", "arrangement", or "understanding". See D. DREXLER, L. BLACK, A. SPARKS, *Delaware Corporation Law and Practice,* § 23.02[2] at 23–8 to 23–9.

As will be discussed in part V, infra, the object of the General Assembly in enacting 8 *Del. C.* § 203 was to prevent coercive takeovers. The statute, therefore, must be construed in a way that accomplishes that object. Cf. *DeJoseph v. Faraone,* Del.Super., 254 A.2d 257 (1969). Given the intent of the statute to prevent abusive takeover tactics and the broad language used in 8 *Del. C.* § 203(c)(8)(iii), it is clear that the section was intended to encompass circumstances where a potential acquiror attempts to acquire an interest in more than 15% of the voting stock of a corporation without formally acquiring ownership or voting rights, otherwise the purpose of the Act could be easily subverted. Contrary to defendants' assertions, there is nothing in 8 *Del. C.* § 203(c)(8)(iii) which limits the Act to non-contingent contracts. The terms "agreement" and "contract" are not synonymous. See *Transamerican Steamship Corp. v. Murphy,* Del. Ch., C.A. No. 10511, Allen, C., 1989 WL 12181 (Feb. 14, 1989), slip op. at 3 n. 1, (holding that no contract was formed although the parties had agreed to all the substantive terms, because the parties made it plain that they would not be bound by contract until a writing evidencing their agreement was executed). "Agreement" means a factual conclusion that two minds have come mutually to accept terms of a proposed contract. *Id.* "Contract", on the other hand, means a legal conclusion that the parties have reached agreement with respect to all material items and "have expressed an intention to bind themselves to perform the promised acts." *Id.*

Even if the Option Agreement was not a binding contract on September 27th due to its contingent nature, it nevertheless was an "agreement, arrangement, or under-

standing" pursuant to 8 *Del. C.* § 203(c)(8)(iii). The use of broad language such as "any", "understanding" and "arrangement" indicates an intent by the General Assembly "to extend beyond agreements and contracts in the classical contractual 'offer' and 'acceptance' sense." See generally *Securities and Exchange Commission v. Savoy Industries,* 587 F.2d 1149, 1163 (D.C.Cir.1978). Such broad language, therefore, applies to all arrangements, whether formal or informal, written or unwritten. *Id.*

Furthermore, the September 27th Option Agreement, on its face, states in numerous places that it is an "agreement, arrangement or understanding". See Option Agreement at 1–2 (Sections 1.1 & 3.2). And Columbia's counsel conceded at oral argument that an "agreement" between Sony and Coca–Cola did, in fact, exist as of September 27th, although he argued that it was not the type of "agreement" contemplated by the statute because it was subject to approval by the Board of Coca–Cola.

Coca–Cola also issued a press release on September 27, 1989, headlined:

"THE COCA–COLA COMPANY GRANTS OPTION TO SONY CORPORATION FOR PURCHASE OF SHARES OF COLUMBIA PICTURES ENTERTAINMENT, INC."

The press release states in the first paragraph that:

"The Coca–Cola Company announced today that it *has given* Sony Corporation an option to purchase all of its Columbia Pictures Entertainment, Inc. stock for $27 per share, representing approximately 49 percent of Columbia's outstanding shares." (emphasis added)

The press release did state in subsequent language, however, that the Option Agreement was subject to the approval of the Coca–Cola Board.

Several filings required by law also indicate that Sony and Coca–Cola intended that September 27, 1989 be the date that Sony became the "owner" of the Columbia stock owned by Coca–Cola. Amendment 12 to Coca–Cola's Schedule 13D, which was filed with the Federal Securities and Exchange

Commission on September 27, 1989, identifies September 27, 1989 as the "Date of Event which Requires Filing of this Statement." Sony's 13D, which was filed on October 3, 1989, also cites September 27, 1989 as the "date of the event which requires filing." Sony and its subsidiaries also filed with the Securities and Exchange Commission and the New York Stock Exchange several "Initial Statements of Beneficial Ownership of Securities on Form 3," which list September 27, 1989 as the date of the event requiring a filing.

The evidence also strongly indicates that the scheduled approval by the Coca–Cola Board on October 2 was a mere formality which was a foregone conclusion.

I, therefore, find that the plaintiff has shown it is reasonably probable that Sony became an "interested stockholder" in Columbia as of September 27, 1989.

Because I find that the plaintiff has shown a reasonable probability that Sony became an "interested stockholder" in Columbia on September 27th pursuant to 8 *Del. C.* § 203(c)(5) and § 203(c)(8)(iii), I need not address whether Sony would also have become an "owner" of Columbia stock on that date pursuant to 8 *Del. C.* § 203(c)(8)(ii).

## V

■ As noted, plaintiff has shown a reasonable probability that he will be able to show that Sony became an "interested stockholder" (as that term is defined in 8 *Del. C.* § 203) of Columbia on September 27, 1989, and it is not disputed that earlier on that same day the Directors of Columbia had approved the proposed business combination with Sony.

The determinative issue, therefore, is whether the transaction is nevertheless exempt from the provisions of 8 *Del. C.* § 203 because of the provisions of 8 *Del. C.* § 203(a)(1).

It is not disputed that 8 *Del. C.* § 203 provides that a business combination subject to the statute cannot be effectuated for three years after the acquiring stockholder became an "interested stockholder"

unless the transaction is excepted from the provisions of the Statute. The two exceptions which are pertinent here are (1) the board of the corporation being acquired timely approves the transaction before the acquiring stockholder became an "interested stockholder" (8 *Del. C.* § 203[a][1] ) or (2) the transaction is subsequently approved by the board and two-thirds of the non-interested stockholders of the corporation to be acquired. (8 *Del. C.* § 203[a][3] ). The parties, however, disagree on whether board approval can occur on the same calendar day that an acquiror became an "interested stockholder."

Defendants urge that the vote of the stockholders of Columbia is not required because the Columbia Board approved the transaction earlier on September 27th—the same day that Sony became an "interested stockholder" of Columbia by entering into the Option Agreement with Coca–Cola. Defendants therefore assert that 8 *Del. C.* § 203(a)(1) grants an exception from the three-year prohibition of 8 *Del. C.* § 203. Plaintiffs urge that the approval was one day too late to trigger the provisions of 8 *Del. C.* § 203(a)(1).

It is undisputed that the Columbia Board approved the transaction on the morning of September 27, 1989 and that several hours later on the same day, Sony executed the Option Agreement permitting it to purchase the 49% stock interest in Columbia owned by Coca–Cola. As previously discussed, this apparently made Sony an "interested stockholder" in accordance with the provisions of 8 *Del. C.* § 203, as of September 27, 1989.

Plaintiff urges that the Board of Columbia could not have acted timely to exempt the transaction from the stockholder vote requirement of 8 *Del. C.* § 203(a)(1) because 8 *Del. C.* § 203(a) states ". . . a corporation shall not engage in any business combination with any interested stockholder for *a period of 3 years following the date that such stockholder became an interested stockholder* unless: (1) *prior to such date* the board of directors of the (to be acquired) corporation approved either the business combination or the transaction

. . ." or "(3) *on or subsequent to such date* the business combination is approved by the board of directors and authorized . . . by the affirmative vote of at least 66⅔% of the outstanding stock."

The plaintiffs assert that the plain meaning of the statute mandates that the transaction be submitted to the stockholders of Columbia for approval pursuant to 8 *Del. C.* § 203(a)(3) because the Board of Columbia did not approve the transaction *"prior to such date"* Sony became an interested stockholder. 8 *Del. C.* § 203(a)(1).

Defendants, on the other hand, claim that the word "date" as used in the statute is ambiguous and that the General Assembly intended that the words "prior to such date" mean "prior to such time" or better "before the time" and that the words "on or subsequent to such date" are intended to mean "subsequent to such time" or better "if after that time".

Needless to say, the draftsmanship of 8 *Del. C.* § 203 leaves much to be desired. The use of the words "prior to such date" or the words "subsequent to such date" violates elementary principals of good legislative drafting. If the drafters had meant "before" or "after" they should have used those words. R. DICKERSON, *Legislative Drafting*, § 7.3, at 77 (1954).

The word "date", however, is ambiguous and it has many meanings. It may mean "time", that is, when something happens, or it may mean a particular day, month or year. As used in 8 *Del. C.* § 203 it can therefore mean either that the approval by the Board of Columbia, to avoid the necessity of a vote by the Columbia stockholders, must have been given on the calendar day before the calendar day Sony became an "interested stockholder" or it can mean that the Columbia Board could have acted at any time prior to the time of day that Sony became an "interested stockholder."

If uncertainty exists in the language of a statute, rules of statutory construction are applied. In the construction of a statute, the Delaware Supreme Court has established the search for legislative intent as the standard. *Spielberg v. State*, Del. Supr., 558 A.2d 291 (1989). And "if a liter-

al interpretation leaves a result inconsistent with the general statutory intention, such interpretation must give way to the general intent". *Home Ins. Co. v. Maldonado*, Del. Supr., 515 A.2d 690 (1986).

In searching for legislative intent, Courts have considered various extrinsic factors, but the most legitimate are drafters' commentaries prepared before a bill is acted upon by a legislature. J. DAVIES, *Legislative Law and Process* § 55–2, at 313 (2d. ed. 1986). See also *Carper v. New Castle County Bd. of Educ.*, Del. Supr., 432 A.2d 1202 (1981); *Allers v. Tittsworth*, 269 Md. 677, 309 A.2d 476 (1973); *Shapiro v. Essex County Bd. of Chosen Freeholders*, 177 N.J.Super. 87, 424 A.2d 1203 (1980), *aff'd.*, 91 N.J. 430, 453 A.2d 158 (1982). Cf. *Clendaniel v. Conrad*, Del. Supr., 83 A. 1036 (1912); *Re v. State*, Del. Supr., 540 A.2d 423 (1988). There are two such commentaries here: the Synopsis, which was part of the bill that enacted 8 *Del. C.* § 203 (66 *Del.L.*, Ch. 204), and the language contained in *The Delaware Takeover Statute: A Report to the Delaware General Assembly* as prepared and submitted to the General Assembly apparently contemporaneously with the bill by the drafters of the statute: The Council of the Corporation Law Section of the Delaware State Bar Association.

The Synopsis states:

"Section 203 is intended to strike a balance between the benefits of an unfettered market for corporate shares and the well documented and judicially recognized need to limit abusive takeover tactics. To achieve this end, the statute will delay for three years business combinations with acquirors not approved by the board unless the acquiror is able to obtain in his offer 85% of the stock as defined in the statute. This provision is intended to encourage a full and fair offer. Following the principles of corporate democracy, two-thirds of the stockholders other than the acquiror may vote or exempt a given business combination from the restrictions of the statute. Any corporation may decide to opt out the statute within 90 days of enactment by action of its board or, at any time, by action of its stockholders. The effect of stockholder action in this regard is delayed for 12 months to avoid circumvention of the statute.

The statute is not intended to alter the case law development of directors' fiduciary duties of care and loyalty in responding to challenges to control or the burden of proof with regard to compliance with those duties. Nor is the statute intended to prevent the use of any other lawful defensive measure."

The Synopsis thus indicates that the primary purpose of 8 *Del. C.* § 203 is to limit abusive takeover tactics and to encourage a full and fair offer for a corporation. Here there is not even an allegation that the offer of Sony is abusive or not fair to the stockholders of Columbia.

The *Report to the Delaware General Assembly*, although not expressly addressing the meaning of the word "date", makes it clear that the essential element to avoid a stockholder vote is the approval by the board of the about-to-be-acquired corporation before the board becomes beholden to the acquiror. M. GOLDMAN & E. McNALLY, *The Delaware Takeover Statute: A Report to the Delaware General Assembly* Section III(a), at 7.

The *Report* also states: "In order to achieve a balance which was discussed by the United States Supreme Court in the *CTS* opinion, seven outs are provided in the new legislation:

(1) The board of directors may approve the acquisition of stock or a business combination *prior to the time that a person becomes an interested stockholder.*

\*　　\*　　\*　　\*　　\*　　\*

(6) *Prior to the time* that an interested stockholder becomes such, the certificate of incorporation or bylaws could be amended by a vote of the stockholders to eliminate the effect of the statute. This amendment would be not effective for a period of 12 months after the vote."

See *Report*, supra, Section III(a), at 7. Section IV of the *Report* also states:

"Section 203 continues this important role of the corporation's board of directors. Under Section 203, *the three-year moratorium is not imposed if, prior to acquiring a 15% position,* the acquiror obtains the board's approval of either the business combination the acquiror intends to use to complete the acquisition (e.g., a merger) or the transaction by which the acquiror obtains 15% or more of the corporation's voting stock. It is intended that as a result of these provisions an acquiror will, initially at least, *negotiate* with the representative of all the stockholders, the corporation's board of directors." (emphasis added)

I therefore conclude that the General Assembly intended that the words "Prior to such date" as they appear in 8 *Del. C.* § 203(a)(1) mean "Before the time".

This result is consistent with the holdings of the few courts that have construed the word "date". *Michel v. Aetna Cas. & Surety Co.,* 252 F.2d 40 (10th Cir.1958); *Kleinschmidt v. Hoctor,* 361 Mo. 29, 233 S.W.2d 649 (1950); *Dwelle–Kaiser Co. v. Niagara County,* 103 Misc. 460, 171 N.Y.S. 361 (1918).

This construction of the word "date" is also consistent with the common and approved usage of the English language. 1 *Del. C.* § 303. 4 OXFORD *English Dictionary* § 262–63 (2d ed. 1989); WEBSTER'S *New World Dictionary of American English* 352 (3d College Ed.1988); AMERICAN HERITAGE *Illustrated Encyclopedic Dictionary* 463 (1987); RANDOM HOUSE *College Dictionary* 335 (rev. ed. 1984).

This result also conforms with the view of several commentators on 8 *Del. C.* § 203, although none of them addressed the specific disputed language. See R.F. BALOTTI & J. FINKELSTEIN, *The Delaware Law of Corporations and Business Organizations* § 6.21m, at 306.18 (Supp. 1988); D. DREXLER, L. BLACK & A.G. SPARKS, *Delaware Corporation Law and Practice* § 23.02 (1988); 1 E. FOLK, R. WARD & E. WELCH, *Folk on the Delaware General Corporation Law* § 203.2.1, at 138 (Supp.1989); C. SMITH & C. FURLOW, *Guide to the Takeover Law of Dela-*

*ware* 3 (1988); VEASEY & FINKELSTEIN, *The Delaware Business Combinations Statute: An Opportunity for Reassessment,* 16 Sec.Reg.L.J. 157 (1988).

Plaintiff's strongest argument is that the words "time" and "date" are used throughout 8 *Del. C.* § 203 in a manner more consistent with plaintiff's position than defendants' view. Compare 8 *Del. C.* § 203(a)(1), (a)(3), (c)(3), and (c)(5). The word "date", however, can have two meanings, as the dictionaries indicate. It seems clear from the preferred dictionary meaning and the legislative history of the Statute that the somewhat inconsistent use of the word "date" by the drafters of 8 *Del. C.* § 203 is imprecise draftsmanship rather than an indication of an intention by the General Assembly to impose an artificial requirement upon the board of a corporation about to be acquired to approve a merger on the day preceding the day an acquiror becomes an "interested stockholder."

I therefore find that the plaintiff has not shown that 8 *Del. C.* § 203 requires a vote by the stockholders of Columbia in the circumstances here.

The motion for a preliminary injunction is denied. IT IS SO ORDERED.