# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| LUIGI CRISPO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 2022-0666-KSJM |
| | ) | |
| ELON R. MUSK, X HOLDINGS I, | ) | |
| INC., AND X HOLDINGS II, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: September 19, 2022
Date Decided: October 11, 2022

Michael Hanrahan, Samuel L. Closic, John G. Day, Robert B. Lackey, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Max Huffman, Joseph A. Pettigrew, SCOTT+SCOTT ATTORNEYS AT LAW LLP, San Diego, California; Scott R. Jacobsen, Jing-Li Yu, SCOTT+SCOTT ATTORNEYS AT LAW LLP, New York, New York; *Counsel for Plaintiff Luigi Crispo*.

Edward B. Micheletti, Lauren N. Rosenello, Ryan M. Lindsay, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Alex Spiro, Andrew J. Rossman, Christopher D. Kercher, Silpa Maruri, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; *Counsel for Defendants Elon R. Musk, X Holdings I, Inc., and X Holdings II, Inc.*

**McCORMICK, C.**

On April 25, 2022, Elon R. Musk, X Holdings I, Inc., and X Holdings II, Inc. (collectively "Defendants") agreed to acquire Twitter, Inc. pursuant to an Agreement and Plan of Merger (the "Merger Agreement"). On July 8, 2022, Defendants purported to terminate the Merger Agreement. Defendants' termination notice inspired two lawsuits in this court. On center stage, Twitter sued Defendants for specific enforcement of the Merger Agreement. Backstage, Twitter stockholder Luigi Crispo ("Plaintiff") sued Defendants on behalf of a class of Twitter stockholders for specific enforcement of the Merger Agreement and, alternatively, damages. Plaintiff also claimed that Defendants comprised a control group with concomitant fiduciary obligations and that they breached those obligations in connection with the Merger Agreement. Defendants have moved to dismiss Plaintiff's class action complaint. Defendants argue that Plaintiff lacks standing to enforce the Merger Agreement and that they did not owe fiduciary duties as controllers. This decision grants the motion to dismiss as to Plaintiff's claims for specific performance and breach of fiduciary duties. This decision further identifies an issue for supplemental briefing.

I.      FACTUAL BACKGROUND

The following facts are drawn from Plaintiff's Verified Shareholder Class Action Complaint (the "Complaint") and the documents it incorporates by reference.[1]

In March 2022, Musk began expressing interest in acquiring or otherwise influencing Twitter. By April 4, 2022, Musk had acquired over 9% of Twitter, and Musk and Twitter agreed that Musk would join Twitter's board of directors (the "Board"). Five

---

[1] *Luigi Crispo v. Elon R. Musk et al.*, C.A. No. 2022-0666-KSJM, Docket ("Dkt.") 1, Verified Shareholder Class Action Complaint ("Compl.").

days later, Musk notified Twitter that he would not be joining the Board and would instead be making an offer to take Twitter private. On April 13, Musk delivered a "best and final" offer to acquire Twitter for $54.20 per share in cash; he publicly announced this offer the following day.[2] In response, the Board approved a stockholders' rights plan, also known as a "poison pill," limiting Musk's ability to acquire additional Twitter stock. Musk then improved the terms of his offer, and Twitter and Defendants signed the Merger Agreement on April 25, 2022.[3]

The Merger Agreement provides that, at the time that the merger becomes effective, each Twitter share will convert into the right to receive $54.20 per share in cash. The Merger Agreement and public statements made by the merger parties emphasize the benefit that Twitter stockholders will receive upon consummation of the merger.[4] The Merger Agreement gives Musk the right to request information from Twitter in connection with the merger.[5] The Merger Agreement also includes provisions that grant Defendants veto power over certain decisions by Twitter.[6]

On May 13, 2022, Musk tweeted: "Twitter deal temporarily on hold."[7] In the days that followed, he publicly expressed concerns about the number of spam and fake accounts

---

[2] Compl. ¶ 18.

[3] Dkt. 15 ("Defs.' Opening Br."), Ex. 1 (Merger Agreement, cited as "Merger Agr.").

[4] *See, e.g.*, Compl. ¶ 19 (Twitter's Board chair stated that the Merger Agreement was "the best path forward for Twitter's stockholders.").

[5] Merger Agr. § 6.4.

[6] *Id.* § 6.1.

[7] Compl. ¶ 45.

on the Twitter service. Pursuant to his information rights under the Merger Agreement, Musk sought information from Twitter regarding spam and fake accounts. On July 8, 2022, Musk's counsel sent a letter to Twitter purporting to terminate the Merger Agreement.

On July 12, 2022, Twitter sued Defendants for specific enforcement of the Merger Agreement. That litigation is currently pending before this court.[8]

Plaintiff owns Twitter stock. He filed this suit on July 29, 2022, asserting two causes of action against Defendants. In Count I, Plaintiff asserts a claim for breach of the Merger Agreement, seeking specific performance and, alternatively, damages. In Count II, Plaintiff asserts a claim for breach of fiduciary duties. Plaintiff brings both claims directly.

Defendants moved to dismiss the Complaint on August 18, 2022. The parties concluded briefing on September 8,[9] and the court held oral argument on September 19.[10]

## II. LEGAL ANALYSIS

Defendants have moved to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6). Under Rule 12(b)(6), "the governing pleading standard . . . to survive a motion to dismiss is reasonable 'conceivability.'"[11] When considering such a motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff

---

[8] *See Twitter, Inc. v. Elon R. Musk et al.*, C.A. No. 2022-0613-KSJM. On October 6, 2022, the court granted Defendants' motion to stay *Twitter, Inc. v. Musk*. *Id.* Dkt. 715.

[9] Dkt. 18 ("Pl.'s Answering Br."); Dkt. 25 ("Defs.' Reply Br.").

[10] Dkt. 35.

[11] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

3

could not recover under any reasonably conceivable set of circumstances susceptible of proof."[12]  The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[13]

Defendants have moved to dismiss each of Plaintiff's claims.  As to Plaintiff's contract claim, Defendants argue that Plaintiff lacks standing because Plaintiff is neither a party nor a third-party beneficiary to the Merger Agreement.  As to Plaintiff's claim for breach of fiduciary duties, Defendants argue that Plaintiff has not adequately alleged that Defendants owe fiduciary duties as controllers of Twitter.

## A.    The Complaint Fails To State A Claim For Specific Performance.

Under Delaware law, only parties to a contract and intended third-party beneficiaries have standing to sue for breach of the contract.[14]  Plaintiff is not a party to the Merger Agreement but argues that he has standing as a third-party beneficiary.

"[A] third person, who is, in effect, a stranger to the contract, may enforce a contractual promise in his own right and name if the contract has been made for his

---

[12] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[13] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Georgia S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[14] *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007) (citing *Comrie v. Enterasys Networks, Inc.*, 2004 WL 293337, at *2 (Del. Ch. Feb. 17, 2004)); *see also Amirsaleh v. Bd. of Trade of City of New York, Inc.*, 2008 WL 4182998, at *4 (Del. Ch. Sept. 11, 2008); *E.I. du Pont de Nemours & Co. v. MacDermid Printing Sols. L.L.C.*, 248 F. Supp. 3d 570, 575 (D. Del. 2017); *Madison Realty Partners 7, LLC v. Ag ISA, LLC*, 2001 WL 406268, at *5 (Del. Ch. Apr. 17, 2001).

4

benefit."[15]  To adequately allege standing as a third-party beneficiary under Delaware law, Plaintiff must plead that (i) the contracting parties intended that the third-party beneficiary benefit from the contract, (ii) the benefit was intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party was a material part of the parties' purpose in entering into the contract.[16]  The above test is conjunctive; a failure to establish any one element defeats third-party beneficiary standing.

Delaware courts are reticent to extend third-party beneficiary status to stockholders under corporate contracts.[17]  Under Delaware law, the board of directors manages the business and affairs of the corporation;[18] this authority extends to litigation assets.[19]  For this reason, Delaware law imposes pleading hurdles on stockholders who seek to stand in

---

[15] *Triple C Railcar Serv., Inc. v. City of Wilmington*, 630 A.2d 629, 633 (Del. 1993) (citing *Wilm. Housing Auth. v. Fidelity & Deposit Co. of Md.*, 47 A.2d 524 (Del. 1946)).

[16] *Madison Realty*, 2001 WL 406268, at *5.

[17] *See Orban v. Field*, 1993 WL 547187, at *9 (Del. Ch. Dec. 30, 1993) (rejecting argument that stockholder had third-party beneficiary status to enforce merger agreement, stating that "[t]he idea of shareholders having directly enforceable rights as third[-]party beneficiaries to corporate contracts is . . . one that should be resisted" as "[o]ne of the consequences of the limited liability that shareholders enjoy is that the law treats corporations as legal persons not simply agents for shareholders"); *see also Amirsaleh*, 2008 WL 4182998, at *4 (observing that this court has "previously bristled at the notion that a stockholder could have 'directly enforceable rights as third-party beneficiaries to corporate contracts'" (quoting *Orban*, 1993 WL 547187, at *9)).

[18] 8 *Del. C.* § 141(a) ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation.").

[19] *See generally Aronson v. Lewis*, 473 A.2d 805, 811–12 (Del. 1984), *overruled in part by Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000).

the shoes of a corporation and enforce a corporate contract.[20] Deeming stockholders third-party beneficiaries of corporate contracts risks unsettling the board-centric model by encroaching on the board's authority over litigation assets.

There are also practical considerations guiding the court's reticence to extent third-party beneficiary status to stockholders, as doing do would also lead to proliferation of stockholder suits in a variety of commonplace scenarios, which would no doubt give rise to considerable inefficiencies both for specific entities and the system as a whole.

Thus, although it is true that a stockholders' equity stake does not "automatically disqualif[y] a stockholder from demonstrating third-party beneficiary status to a corporate contract,"[21] this court has extended third-party beneficiary status to stockholders under corporate contracts in limited circumstances.[22]

One might posit that the argument for granting third-party beneficiary status to stockholders is stronger in the case of merger agreements, because merger agreements

---

[20] Ct. Ch. R. 23.1; *see also United Food & Com. Workers Union & Participating Food Indus. Empls. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021) (articulating requirements for stockholder to sue on behalf of corporation without first making demand on board).

[21] *Arkansas Teacher Ret. Sys. v. Alon USA Energy, Inc.*, 2019 WL 2714331, at *12 (Del. Ch. June 28, 2019)

[22] *See, e.g.*, *id.* at *12–14 (granting stockholders third-party beneficiary standing to enforce a corporate contract); *Dolan v. Altice USA, Inc.*, 2019 WL 2711280 (Del. Ch. June 27, 2019) (declining to dismiss stockholder claim seeking to enforce a corporate contract and calling for extrinsic evidence to assess stockholder's third-party beneficiary status); *Amirsaleh*, 2008 WL 4182998, at *4–5 (granting former member of the Board of Trade of the City of New York third-party beneficiary standing under corporate contract); *but see Orban,* 1993 WL 547187, at *9 (cautioning against granting stockholders third-party beneficiary standing under corporate contracts).

involve the payment of consideration directly to stockholders. Indeed, delivering this benefit to stockholders is the target corporation's purpose for entering in most merger agreements.

Yet, it is this unique aspect of merger agreements that enhances the need to recognize the contractual freedom of the board of directors. In the sale context, "[t]he directors' role change[s] from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company."[23] When exercising its fiduciary duties to maximize stockholder value in that context, a board needs the contracting freedoms available to other contracting parties, including the ability to control any litigation to enforce the agreement and to extract value by eliminating the risk that a multitude of individual stockholders might seek to sue a buyer directly under the merger agreement.

Defendants argue that the Board exercised its contractual freedom to disclaim third-party beneficiary status under the Merger Agreement. Focusing on the first element of the third-party beneficiary test, Defendants contend that express language of Section 9.7 of the Merger Agreement reveals that the contracting parties did not intend to convey third-party beneficiary status to Twitter's stockholders. Titled "No Third-Party Beneficiaries," Section 9.7 provides that:

> Subject to Section 9.13, this Agreement is not intended to and shall not confer upon any Person other than the parties hereto any rights or remedies hereunder; provided, however, that it is specifically intended that (A) the D&O Indemnified Parties

---

[23] *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del. 1986).

(with respect to Section 6.6 from and after the Effective Time),
(B) the Company Related Parties (with respect to Section 8.3)
are third-party beneficiaries and (C) the Parent Related Parties
(with respect to Section 8.3) are third-party beneficiaries.[24]

Broken down, Section 9.7 contains a blanket prohibition followed by a proviso identifying three specific carve-outs. Plaintiff does not argue that this lawsuit falls within the three carve-outs.[25] The blanket prohibition states that the Merger Agreement "shall not confer upon any Person other than the parties hereto any rights or remedies hereunder,"[26] Combined with the title of the section, the blanket prohibition signals an intent to disclaim stockholders as third-party beneficiaries.

"No third-party beneficiaries" provisions like Section 9.7 provide a helpful starting point for a court's consideration of the contracting parties' intent as to third-parties,[27] but this court distinguishes between boilerplate and customized "no third-party beneficiaries"

---

[24] Merger Agr. § 9.7 (emphasis omitted).

[25] Pl.'s Answering Br. at 27–28.

[26] *Id.*

[27] *See Fortis Advisors LLC v. Med. Co., & Melinta Therapeutics, Inc.*, 2019 WL 7290945, at *3 (Del. Ch. Dec. 18, 2019) ("Delaware courts will enforce contractual provisions disclaiming an intent to benefit third parties."); *see also United Rentals, Inc. v. RAM Hldgs., Inc.*, 2007 WL 4327770, at *1 (Del. Ch. Nov. 29, 2007) (holding that a third-party intervenor lacked standing to enforce a merger agreement when "[t]he merger agreement explicitly states that its only intended beneficiaries are the parties to the agreement themselves"); *Capano v. Capano*, 2014 WL 2964071, at *13 (Del. Ch. June 30, 2014) (rejecting third-party standing claim when language of trust agreement "plainly articulates its drafter's intent to exclude third-party beneficiaries"); *Kronenberg v. Katz*, 872 A.2d 568, 605–06 (Del. Ch. 2004) (holding that non-party to a contract was not a third-party beneficiary because the "plain language" of the agreement disclaimed third-party benefits unless "expressly provide[d]" for, and the agreement did not "expressly provide for [the claimant] to benefit from its terms" and noting that "parties may . . . expressly provide that a nonparty shall not have any rights as a third-party beneficiary").

8

provisions. This court has disregarded "boilerplate" or "general" "no third-party beneficiaries" provisions in a contract that includes more specific language demonstrating an intent to benefit a third party.[28] When a "no third-party beneficiaries" provision is "customized," however, such as when it "contains a carve-out" listing some groups as third-party beneficiaries, this court has concluded that the parties knew how to confer third-party beneficiary status and deliberately chose not to do so with respect to any unlisted groups.[29]

Section 9.7 of the Merger Agreement is more customized than other "no third-party beneficiaries" provisions enforced by this court. In *Fortis Advisors*, for example, the court enforced a provision that contained a single carveout.[30] There, the court observed that the "negative implication" of the one carve-out was that "other third parties are not intended beneficiaries."[31] The presence of three carve-outs in Section 9.7 makes the negative implication stronger.

Moreover, one of the carve-outs identifies Twitters' stockholders as third-party beneficiaries in a limited scenario not implicated here. Section 9.7(B) identifies "Company Related Parties (with respect to Section 8.3)" as third-party beneficiaries.[32] The term

---

[28] *See, e.g.*, *Amirsaleh*, 2008 WL 4182998, at *5 ("[A]lthough the Merger Agreement contains a general provision disclaiming the existence of any third-party beneficiaries, such disclaimer is belied by the Agreement's specific grant of benefits to NYBOT Members." (footnote omitted)).

[29] *See, e.g.*, *Fortis Advisors*, 2019 WL 7290945, at *4.

[30] *Id.*

[31] *Id.*

[32] Merger Agr. § 9.7(B).

9

"Company Related Parties" is defined in Section 8.3(c)(i) of the Merger Agreement to expressly include "stockholders."[33]  No other definitions in the Merger Agreement are defined to include Twitter "stockholders."  Section 8.3(c)(i) serves to protect Twitter stockholders from liability in the event of a failure to consummate the Merger Agreement by limiting the buyer's remedy.[34]  Because Defendants are not seeking damages from Twitter stockholders, Section 8.3(c)(i) is not implicated and does not confer third-party beneficiary status on Plaintiff here.[35]  The inference from Section 9.7's inclusion of stockholders as third-party beneficiaries expressly for purposes of protecting them from liability is that stockholders are not third parties in other contexts.[36]

Thus, the plain language of Section 9.7 supports a holding that the parties to the Merger Agreement did not intend to confer third-party beneficiary standing to Twitter's stockholders.

---

[33] *Id.* § 8.3(c)(i).

[34] *Id.*

[35] As to Section 8.3(c), Plaintiff also argues that because Section 8.3 uses the term "Company Related Parties" in one section and the term "the Company" in another, it permits Twitter stockholders to pursue a remedy beyond the express limits of Section 8.3(c).  *See* Pl.'s Answering Br. at 24–25.  Plaintiff's construction of Section 8.3(c), however, presumes that Twitter stockholders have third-party beneficiary status; it does not independently support that conclusion.

[36] *See Fortis Advisors*, 2019 WL 7290945, at *4 ("The negative implication created by [the contract's] express inclusion of Financing Sources as third-party beneficiaries is that other third parties are not intended beneficiaries.") (citing *Delmarva Health Plan, Inc. v. Aceto*, 750 A.2d 1213, 1216 & n.12 (Del. Ch. 1999) (recognizing that the *expressio unius est exclusio alterius* maxim applies in the contractual interpretation context)).

Defendants contend that the language of Section 9.7 is dispositive and that the analysis should end here. And Delaware courts indeed give "no third-party beneficiaries" clauses a non-trivial amount of weight.[37] But such clauses are not entitled to any special deference beyond that generally granted to contractual terms, and they do occasionally yield to other contrary language consistent with standard rules of contract interpretation.

In this case, Plaintiff argues that Section 9.7 is not so ironclad as to foreclose standing for Twitter stockholders. Plaintiff advances two arguments urging the court to extend the analysis beyond the plain language of Section 9.7 and find that Plaintiff has standing as a third-party beneficiary. Plaintiff first analogizes to Delaware case law recognizing that stockholders can have third-party beneficiary standing despite a "no third-party beneficiaries" clause. This decision refers to Plaintiff's first argument as the "precedent-based argument." Plaintiff next argues that other, specific provisions of the Merger Agreement evidence an intent contrary to Section 9.7 to confer third-party beneficiary status to Twitter stockholders. This decision refers to Plaintiff's second argument as his "textual argument." As part of his textual argument, Plaintiff specifically calls out Section 8.2 of the Merger Agreement, which defines damages to include lost stockholder premium.

---

[37] *See id.* at *3 ("Delaware courts will enforce contractual provisions disclaiming an intent to benefit third parties."); *see also United Rentals*, 2007 WL 4327770, at *1 (enforcing "no third-party beneficiaries" clause); *Capano*, 2014 WL 2964071, at *13 (same); *Kronenberg*, 872 A.2d at 605–06 (same).

Plaintiff's precedent-based argument relies primarily on three decisions of this court declining to foreclose third-party beneficiary standing for equity holders of a contracting party—*Amirsaleh*, *Alon*, and *Dolan*.[38] Each is distinguishable in important ways.

In the first case, *Amirsaleh*, the court held that a former member of the Board of Trade of the City of New York ("NYBOT") had third-party beneficiary standing to assert post-closing claims for breach of a merger agreement.[39] The merger agreement at issue granted NYBOT members the ability to elect to receive merger consideration in the form of either shares or cash.[40] "Upon election, shares or a check were issued directly to members."[41] To make the election, a member was required to return an election form by a date certain.[42] Any member who failed to return the election form by the deadline was cashed out.[43] The plaintiff member wanted to elect to receive the merger consideration in shares, but he did not receive an election form in the mail.[44] He therefore did not return the election form by the deadline and his interests were cashed out.[45]

---

[38] Pl.'s Answering Br. at 25–27 (discussing *Amirsaleh*, 2008 WL 4182998, *Alon*, 2019 WL 2714331, and *Dolan*, 2019 WL 2711280).

[39] *Amirsaleh*, 2008 WL 4182998, at *4–5.

[40] *Id.*

[41] *Id.* at *4.

[42] *Id.* at *2.

[43] *Id.* at *3.

[44] *Id.* at *2.

[45] *Id.* at *3.

The *Amirsaleh* court held that the plaintiff had third-party beneficiary standing for the limited purpose of "enforc[ing] his right to elect the form of his consideration under the Merger Agreement"—a "right 'clearly provided by the Agreement.'"[46] In reaching this conclusion, the court rejected the defendants' arguments that a generalized "no third-party beneficiary" provision required the court to ignore specific rights granted to the stockholders in the merger agreement.[47] Invoking the general/specific canon, the court observed that, "although the Merger Agreement contains a general provision disclaiming the existence of any third-party beneficiaries, such disclaimer is belied by the Agreement's specific grant of benefits to NYBOT members."[48]

Plaintiff argues that *Amirsaleh* stands for the general proposition that stockholders are intended third-party beneficiaries where a merger agreement provides for specific payments to them and is subject to a stockholder vote, regardless of an express "no third-party beneficiaries" clause. To be sure, excerpts of *Amirsaleh* could be read to support Plaintiff's interpretation.[49] In addition to the *Amirsaleh* court's reasoning based on the general/specific canon, the court stated that "there is little legitimate question that the members of NYBOT were intended beneficiaries of the Merger Agreement, because the

---

[46] *Id.* at *11 (quoting *Benerofe v. Cha*, 1998 WL 83081, at *6 n.22 (Del. Ch. Feb. 20, 1998)).

[47] *Id.* at *5.

[48] *Id.* at *5 (footnote omitted). Defendants do not address *Amirsaleh* in their standing argument but do distinguish it in their ripeness argument. Defs.' Opening Br. at 14–15.

[49] *Amirsaleh*, 2008 WL 4182998, at *4 (observing that the members were third-party beneficiaries where the merger agreement provided for members to receive cash or shares for their membership interests and was subject to member approval).

13

Agreement manifests an unambiguous intent to benefit the NYBOT Members," by providing for members to receive cash or shares for their membership interests.[50] The court further observed that the requirement of member approval supported a finding that members were third-party beneficiaries.[51] Divorced from context, these excerpts of *Amirsaleh* could be read to support Plaintiff's interpretation.

Plaintiff's broad interpretation of *Amirsaleh*, however, is problematic. Because almost all merger agreements require direct payments of consideration to stockholders and are subject to stockholder approval,[52] Plaintiff's interpretation of *Amirsaleh* would support extending third-party beneficiary status to target stockholders under almost all merger agreements. As discussed above, this court is hesitant to grant third-party beneficiary status to stockholders under corporate contracts. Doing so risks upending the normal relationship between boards and stockholders, encroaching on the contractual freedom of the board, and engendering duplicative and thus wasteful litigation, and therefore should be limited to exceptional circumstances.[53] The court thus rejects Plaintiff's broad interpretation of *Amirsaleh*.

Better understood, *Amirsaleh* is a context-specific application of the general/specific canon. The court rejected the notion that a generalized "no third-party

---

[50] *Id.*

[51] *Id.* at *4 (citing *Hadley v. Shaffer*, 2003 WL 21960406, at *5 (D. Del. Aug. 12, 2003)).

[52] *See* 8 *Del. C.* §251(c); *see also Revlon*, 506 A.2d at 182 (holding that in the context of a corporate sale, the duty of a board is "the maximization of the company's value at a sale for the stockholders' benefit").

[53] *See Orban*, 1993 WL 547187, at *9.

14

beneficiaries" clause could override specific provisions granting clear and unique election rights to members and granted the member third-party beneficiary standing for the limited purpose of pursuing that unique right. Here, Section 9.7 is specific rather than general. The rights vested to stockholders are not unique vis-à-vis the contracting party, Twitter. And Plaintiff seeks standing to pursue all rights and remedies under the Merger Agreement, not limited rights.

*Amirsaleh* can also be praised for its practical approach to the law concerning third-party beneficiary standing. Had the court denied third-party beneficiary status to the plaintiff, neither the contracting party nor anyone else would have been positioned to enforce the plaintiff-member's election rights under the merger agreement. When a provision of a contract cannot be enforced except by a third party, it is reasonable to infer that the parties intended the provision to confer an enforceable benefit to that third party. Here, Twitter is well situated to enforce the Merger Agreement.[54] By urging the court to infer that the parties to the Merger Agreement intended that Plaintiff would be permitted to duplicate Twitter's extensive litigation efforts, Plaintiff asks the court to extend the practical approach of *Amirsaleh* to impractical ends. That outcome would not serve any salutary purpose. *Amirsaleh* does not support Plaintiff's position.

---

[54] Plaintiff raises arguments to the contrary, contending that Twitter's directors and executives could be incentivized to achieve a settlement that is contrary to the stockholders' interests. Such concerns are speculative and unripe. They are not grounds to deem stockholders third-party beneficiaries of the Merger Agreement.

In the second case relied on by Plaintiff, *Alon*, the court found that a stockholder of Alon USA Energy, Inc. had standing to enforce an agreement (the "Section 203 Agreement") adopted as a condition to an acquirer receiving approval under Section 203 of the Delaware General Corporation Law.[55] The Section 203 Agreement did not contain a "no third-party beneficiaries" provision, and the agreement mimicked the protections of Section 203. As the court observed, "Section 203 protections directly benefit stockholders of a Delaware corporation" against "hostile corporate takeovers" and serve to "encourage a full and fair offer."[56] The court imputed the purpose of Section 203 to the Section 203 Agreement and held that it was reasonably conceivable that the contracting parties intended that the Section 203 Agreement confer enforceable benefits to Alon USA Energy's stockholders.[57] After concluding that the other elements of the third-party beneficiary test also favored the plaintiff, the court denied the motion to dismiss for lack of standing.[58]

Here, unlike in *Alon*, there is a "no third-party beneficiaries" provision to factor into the analysis. Additionally, the Section 203 Agreement in *Alon* is distinguishable from the relatively commonplace Merger Agreement at issue here. *Alon* does not support Plaintiff's position.

In the last case relied upon by Plaintiff, *Dolan*, this court denied a motion to dismiss claims brought by former stockholders of Cablevision Systems Corp. seeking to enforce

---

[55] *Alon*, 2019 WL 2714331, at *10–14.

[56] *Id.* at *13 (internal quotations omitted).

[57] *Id.*

[58] *Id.* at *13–14.

the terms of a merger agreement between Cablevision and Altice N.V.[59]  The plaintiffs in

*Dolan*, however, were no ordinary stockholders.  They were founders of Cablevision and

had independently bargained with Altice for the very provision they sought to enforce

through the lawsuit.[60]  That provision required Altice to operate one of Cablevision's

assets, News12 Networks LLC, in accordance with News12's existing business plan for at

least five years.[61]  The plaintiffs initially sought to carve out News12 from the deal, and

they agreed to sell it only on the condition that that this protective provision was included

in the merger agreement.[62]  The defendants moved to dismiss the complaint for lack of

standing, and the court denied that motion on the grounds that it was reasonably

conceivable that the plaintiffs were third-party beneficiaries of the merger agreement.

Specifically, the court held that it was reasonably conceivable that such *quid pro quo*

bargaining would satisfy the first part of the third-party beneficiary analysis.[63]

Like *Amirsaleh* and *Alon*, the *Dolan* decision involved an unusual contract.  The

*Dolan* plaintiffs participated in merger negotiations independently from the target company

and specifically negotiated the contractual language that they later sought to enforce.

Plaintiff here does not plead that he or any other stockholder independently secured the

contractual commitments that he now seeks to enforce.  Also, as in *Amirsaleh*, had the

---

[59] *Dolan*, 2019 WL 2711280, at *1–2.

[60] *Id.* at *3.

[61] *Id.*

[62] *Id.*

[63] *Id.* at *7.

17

*Dolan* court dismissed the plaintiffs' claims on the basis of a lack of third-party standing, no one else was positioned to enforce the contractual language at issue. Here, again, Twitter itself is vigorously seeking to enforce the same Merger Agreement as Plaintiff. *Dolan* does not support Plaintiff's position.

In sum, Plaintiff's precedent-based argument does not support his claim to third-party beneficiary status. Plaintiff's textual argument fares only slightly better.

In support of his textual argument, Plaintiff first points to a series of provisions of the Merger Agreement concerning the mechanics of the merger.[64] The mechanics provisions, however, do not indicate an intent to confer third-party beneficiary status to stockholders. Generally, the representations and covenants in Sections 5.4 and 6.10 of the Merger Agreement concern Defendants' obligation to provide the financing to fund the purchase of the shares of Twitter stockholders.[65] Among other things, these provisions collectively require Defendants to, on the closing of the transaction, place the merger consideration in a fund for the benefit of Twitter stockholders and to use the fund to pay $54.20 per share to Twitter's stockholders. These provisions lack the degree of specificity necessary to overcome the plain language of Section 9.7, which clearly disclaims any

---

[64] *See* Pl.'s Answering Br. at 22 (citing Merger Agr. Art. II (describing the principle purpose of the agreement as "the merger"), §§ 2.1, 2.2, 2.3 ("describ[ing] the mechanics for the Merger"), § 3.1(c) ("provid[ing] for Defendants' purchase of the shares of the Twitter stockholders for $54.20 per share"), and § 3.2(a) ("requir[ing] Musk's acquisition entity . . . to deposit the Aggregate Merger Consideration into an Exchange Fund and '. . . cause the Exchange Fund . . . to be held for the benefit of the holders of Company Common Stock'")).

[65] Pl.'s Answering Br. at 23 (citing Merger Agr. §§ 5.4, 6.1, and 7.1(a)).

18

intention for stockholders to have any rights to enforce or seek damages under the Merger

Agreement.[66]

Plaintiff also calls out Section 8.2 of the Merger Agreement, which describes the

effect of termination on "liability or damages" as follows:

> except as otherwise provided in Section 8.3 or in any other provision of this Agreement, no such termination shall relieve any party hereto of any liability or damages (which the parties acknowledge and agree shall not be limited to reimbursement of Expenses or out-of-pocket costs, and, in the case of liabilities or damages payable by Parent and Acquisition Sub, would include *the benefits of the transactions contemplated by this Agreement lost by the Company's stockholders) (taking into consideration all relevant matters, including lost stockholder premium*, other combination opportunities and the time value of money), which shall be deemed in such event to be damages of such party, resulting from any knowing and intentional breach of this Agreement prior to such termination, in which case, except as otherwise provided in Section 8.3, *the aggrieved party shall be entitled to all rights and remedies at law or in equity.*[67]

Section 8.2's discussion of "*the benefits of the transactions contemplated by this*

*Agreement lost by the Company's stockholders . . . including lost stockholder premium*"

suggests that the parties to the Merger Agreement intended that the stockholders be restored

to the same position they would have been in had the Merger Agreement been fully

performed. The reference to "lost stockholder premium," therefore, provides Plaintiff's

---

[66] At best, these provisions would grant to stockholders the right to enforce their claim to merger consideration after the merger closes. Such a claim would be unripe at this stage, and the court therefore need not analyze how that argument would play out.

[67] Merger Agr. § 8.2 (emphasis added).

strongest argument that the parties to the Merger Agreement intended to confer some form of third-party beneficiary status to Twitter stockholders.

If Section 8.2 evinces an intent to confer third-party beneficiary status to Twitter stockholders, however, then such standing is restricted to claims for damages. This is evident from the purpose of the language of Section 8.2, which, again, speaks to the effect of termination on liability and damages. Plaintiff argues that the phrase "aggrieved party" in Section 8.2 is generic and should be read to include stockholders, and further read to explicitly grant stockholders "all rights and remedies in law and equity," including specific performance. But this is a misreading. In context, the phrase "aggrieved party" serves to clarify that the grant of "all rights and remedies" applies only to the non-breaching party. "Party" is consistently used elsewhere in the Merger Agreement and Section 8.2 to refer exclusively to the parties to the agreement; "aggrieved" serves to narrow that group by excluding the breaching party, not expand it to include stockholders. Section 8.2 therefore does not demonstrate the parties' intention to give stockholders an independent right to specifically enforce the Merger Agreement.[68]

---

[68] Defendants also argue that Section 9.9 of the Merger Agreement "limits specific performance to contractual parties only" by providing that "'the *parties* hereto acknowledge and agree that the *parties* hereto shall be entitled to . . . specific performance . . . .'" Defs.' Reply Br. at 5 (quoting Merger Agr. § 9.9) (emphases supplied by Defendants, ellipses added). Although this decision agrees with Defendants' conclusion that stockholders may not pursue direct claims for specific enforcement of the Merger Agreement, Section 9.9 does not stand for that proposition. In my view, Section 9.9 merely memorializes the parties understanding that specific performance would be available in the event of breach. Standing alone, it does not expressly or impliedly foreclose third-party beneficiaries from seeking specific performance.

Whether language like that found in Section 8.2 conveys third-party beneficiary status to stockholders as to damages claims is a thorny legal issue. The language of Section 8.2 appears to have emerged in response to the Second Circuit's decision in *Consolidated Edison, Inc. v. Northeast Utilities* ("*Con. Edison*").[69] There, the stockholders of Northeast Utilities sued Consolidated Edison for the $1.2 billion premium that Consolidated Edison would have paid had the deal closed.[70] Applying New York law, the federal trial court held that the stockholders had standing as third-party beneficiaries to sue for lost stockholder premium.[71]

The Second Circuit reversed on appeal, concluding based on a "no third-party beneficiaries" provision that Northeast Utilities' stockholders lacked third-party beneficiary status to enforce the merger agreement.[72] The "no third-party beneficiaries" provision at issue contained a blanket prohibition subject to two carve-outs.[73] One of the carve-outs dealt with personal liability and was not at issue.[74] The other carve-out granted stockholders standing to enforce the right to receive cash or stock in the post-merger entity, but that right did not arise until the contractually defined "Effective Time" (which occurred

---

[69] 426 F.3d 524 (2d Cir. 2005).

[70] *Id*. at 527.

[71] *Con. Edison*, 249 F. Supp. 2d 387, 416–17 (S.D.N.Y. 2003), *rev'd in part*, 426 F.3d 524 (2d Cir. 2005).

[72] *Con. Edison*, 426 F.3d at 527–31.

[73] *Id.* at 527–28.

[74] *Id.* at 528.

21

at the completion of the merger) and thus never arose.[75]  Because neither of the carve-outs applied, the court enforced the blanket prohibition, holding that the stockholders lacked standing to sue Consolidated Edison for breach of the merger agreement.[76]

Transactional attorneys responded to *Con. Edison* by crafting contractual language that was intended to allow their clients to obtain damages for lost stockholder premium in the event of a busted deal.[77]  In 2007, transactional attorneys Victor I. Lewkow and Neil Whoriskey wrote an article cataloguing "anti-*Con. Edison*" provisions in merger agreements.  They observed that, although "several major variants of the anti-*Con. Edison* remedies language" emerged, "*none* that [they had seen] grant target stockholders the right to enforce the merger contract directly . . . ."[78]  No contracting parties viewed this as an attractive solution, in the authors' view.[79]

---

[75] *Id.*

[76] *Id.*

[77] Victor I. Lewkow and Neil Whoriskey, *Left at the Altar: Creating Meaningful Remedies for Target Companies*, The M&A Lawyer (October 2007), Westlaw; *see also, generally*, Lou R. Kling & Eileen T. Nugent, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 15A.03 (2022 ed.).

[78] *Id.* (emphasis added).

[79] *Id.* (observing that "neither buyer nor target has any interest in permitting target stockholders to pursue claims for breach independently" because "[t]arget will want to preserve for itself the right to control this critical litigation-including the right to settle such litigation . . . and [b]uyer will not want to negotiate/litigate with potentially unorganized and uncoordinated groups of shareholders should a breach be alleged"); *see also* Kling & Nugent, *supra*, at 15A-7 to -8 ("The reason for not making target stockholders third-party beneficiaries is clear.  It is one thing to have a single litigation with the target itself in a jurisdiction that has been negotiated and agreed upon between the parties if the parties have a dispute, for example, concerning an alleged failure of a closing condition.  It is quite another to have to deal with hundreds of lawsuits all around the country from disgruntled target shareholders.").

Alternatives to naming stockholders third-party beneficiaries arose; one is relevant here. As described by Lewkow and Whoriskey, one anti-*Con. Edison* approach was to define damages in a merger agreement by references to "lost shareholder premium" or to "shareholders' loss of the 'benefit of the bargain.'"[80] Lewkow and Whoriskey made clear that the damages-definition approach "*does not grant target stockholders status as third-party beneficiaries*, but rather attempts to measure damages to the target by reference to 'lost shareholder premium' or to the 'benefit of the bargain lost by a party's shareholders' arising from a willful breach of the merger agreement."[81] A leading treatise, Fleischer et al.'s *Takeover Defense: Mergers and Acquisitions* ("Fleischer"), endorsed this view.[82] Citing Lewkow and Whoriskey's assessment favorably, the treatise observed that the "damages definition approach" "does not grant the target shareholders third-party beneficiary status, but rather attempts to define the target company's damages by reference to its shareholders' lost merger premium or to the 'benefit of the bargain' lost by its shareholders."[83]

Section 8.2 adopts damages-definition language like that described by Lewkow and Whoriskey. It defines liability and damages with reference to "the benefits . . . lost by the

---

[80] Lewkow and Whoriskey (emphasis added) (footnotes omitted).

[81] *Id.*

[82] Arthur Fleischer et al., *Takeover Defense: Mergers and Acquisitions 9th Edition* § 19.06(C) (2022).

[83] *Id.* (footnote omitted) (citing Lewkow and Whoriskey). Another "solution might be a provision (which admittedly has not yet been tested in court) that makes target shareholders third-party beneficiaries but provides that only the target itself would be permitted to enforce their third-party rights on their behalf." Kling & Nugent, at 15A-8.

Company's stockholders . . . taking into consideration . . . lost stockholder premium[.]"[84] This language mimics, nearly verbatim, the provisions described by Lewkow and Whoriskey as "anti-*Con. Edison*" damages-definition provisions that are not intended to grant third-party beneficiary status to stockholders.

Therefore, when faced with the choice of how to handle stockholders' losses in the event of a termination, the parties to the Merger Agreement adopted language that one set of practitioners and one leading treatise has identified as setting the parties on a course free of the hazard of direct stockholder claims like those filed by Plaintiff. This weighs against Plaintiff's construction of Section 8.2.

That said, the parties have not had an opportunity to respond to the points raised (*sua sponte*) in this decision concerning Section 8.2 based on *Con. Edison*, Lewkow and Whoriskey, or Fleischer. Because Plaintiff's Section 8.2 argument, at best, would grant Plaintiff standing to pursue a claim for damages only, there is no urgency in resolving it. The parties are granted leave to submit supplemental briefing on the issue. Defendants also have argued that if Plaintiff has third-party beneficiary status to assert a direct claim for damages, then such a claim is unripe. The court will revisit that argument in the context of supplemental briefing.

For these reasons, Plaintiff have not adequately alleged third-party beneficiary standing to specifically enforce the Merger Agreement. Their claim for specific

---

[84] Merger Agr. § 8.2.

performance of the Merger Agreement is, therefore, dismissed. The remaining aspects of Defendants' motion to dismiss Count I are held in abeyance pending supplemental briefing.

### B. The Complaint Fails To State A Claim For Breach Of Fiduciary Duty.

"The equitable tort for breach of fiduciary duty has only two formal elements: (i) the existence of a fiduciary duty and (ii) a breach of the duty."[85] In moving to dismiss Plaintiff's claim for breach of fiduciary duty, Defendants contest only the first element—Defendants' fiduciary status.

The cleanest way to establish control sufficient to give rise to fiduciary status is to demonstrate that the Defendants have the ability to exercise a majority of the company's voting power.[86] Defendants have never held voting control of the company. They own only less than 10% of Twitter's stock.

Majority stock ownership, however, is not a prerequisite to controller status. "Another means of pleading control is to allege facts that support a reasonable inference that the defendants in fact exercised control over the business and affairs of the corporation."[87]

Effective control can be general or transaction-specific.[88] "To show that the requisite degree of control exists generally, a plaintiff may establish that a defendant or

---

[85] *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *23 (Del. Ch. July 6, 2018).

[86] *Voigt v. Metcalf*, 2020 WL 614999, at *11 (Del. Ch. Feb. 10, 2020).

[87] *Id.* (cleaned up).

[88] *Basho*, 2018 WL 3326693, at *25 (collecting cases).

group of defendants exercise sufficient influence 'that they, as a practical matter, are no differently situated than if they had majority voting control.'"[89]

To plead the requisite degree of control for purposes of a particular transaction, a plaintiff must plead facts supporting a reasonable inference that a defendant can exercise "control over the corporation specifically for purposes of the challenged transaction."[90]

Controller status is a fact-specific inquiry.[91] Control can flow from aggregated sources of influence, including voting power and softer sources of power.[92] Control includes the possession of direct or indirect power to choose the direction of the management or policies of a company, whether through stock ownership, contract, or otherwise.[93] Factors that are relevant to the determination of control can include: stock ownership; contractual blocking rights; contractual rights to channel the corporation into a particular outcome; commercial relationships; relationships with particular directors; and the ability to influence the board.[94] "Rarely (if ever) will any one source of influence or

---

[89] *Id.* (quoting *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006)).

[90] *Voigt*, 2020 WL 614999, at *11.

[91] *Voigt*, 2020 WL 614999, at *22; *In re Tilray, Inc. Reorg. Litig.*, 2021 WL 2199123, at *12 (Del. Ch. June 1, 2021); *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *13 (Del. Ch. Mar. 28, 2018).

[92] *Voigt*, 2020 WL 614999, at *12.

[93] *In re Ezcorp Inc. Consulting Agreement Derivative Litig.*, 2016 WL 301245, at *9 (Del. Ch. Jan. 25, 2016).

[94] *Basho*, 2018 WL 3326693, at *26 (collecting cases); *Voigt*, 2020 WL 614999, at *12 (collecting cases).

indication of control, standing alone, be sufficient to make the necessary showing."[95] Rather, "a reasonable inference of control at the pleading stage . . . typically results when a confluence of multiple sources combines in a fact-specific manner to produce a particular result."[96]

Here, Plaintiff advances a transaction-specific theory of control, contending that Defendants controlled Twitter leading up to the execution of the Merger Agreement and at the time of termination for the purpose of the Merger Agreement. Plaintiff cites to numerous factors in support of that theory, and this decision analyzes these factors below for completeness.

Before turning to the factor-based analysis, it is worth taking a step back to address the context in which Plaintiff advances his transaction-specific theory of control. After Musk rapidly accumulated Twitter stock on the open market, Twitter adopted a rights plan to thwart a creeping takeover, channeling Musk to the Board for negotiations. The Board engaged Musk in negotiations and secured what has been described as a seller-friendly Merger Agreement. After Defendants issued a termination notice on July 8, 2022, Twitter promptly sued Defendants. Defendants counterclaimed. That litigation has been as epic as one would imagine. Plaintiff essentially asks this court to ignore the Titanomachy of the Twitterverse proceeding in parallel and declare that Defendants controlled Twitter

---

[95] *Basho*, 2018 WL 3326693, at *28; *Voigt*, 2020 WL 614999, at *13.
[96] *Basho*, 2018 WL 3326693, at *28.

before and at the time of termination. At the thirty-thousand-foot level, that is simply not a reasonable ask.

Plaintiff's argument does not improve when evaluated on the factor-based level. Plaintiff argues that four factors give rise to an inference of transaction-specific control at the time of termination: Defendants' (i) direct share ownership and their ability to acquire shares under the Merger Agreement; (ii) contract rights under the Merger Agreement; (iii) influence over the Twitter Board; [97] and (iv) unique personal attributes.[98] This analysis considers the factors first in isolation and then in the aggregate.

First, there is stock ownership. Defendants own between 9 and 10% of Twitter's stock. Defendants' Twitter shares represent an investment of about $3 billion.[99] Even at this eye-popping toehold, a less-the-10% voting percentage is typically not enough, standing alone, to give rise to an inference of control.[100] Plaintiff does not contend otherwise.

Plaintiff instead seeks to augment Defendants' ownership percentage in two ways.

---

[97] This argument is referenced only obliquely in the complaint and is developed primarily in Plaintiff's briefing. Complaint ¶17; Pl.'s Answering Br. at 50. This decision assumes that the argument was properly raised and addresses its substance, which is unavailing in any case.

[98] Complaint ¶¶ 3, 67, 83; Pl.'s Answering Br. at 45.

[99] Pl.'s Answering Br. at 3.

[100] See, e.g., In re Morton's Rest. Grp., Inc. S'holders Litig., 74 A.3d 656, 665 (Del. Ch. 2013) (stockholder with a 27.7% block and two board seats was not a controller); Larkin v. Shah, 2016 WL 4485447, at *14–15 (Del. Ch. Aug. 25, 2016) (stockholder group with 23.1% block and three board seats was not a controller); see also In re Crimson Expl. Inc. S'holder Litig., 2014 WL 5449419, at *10 (Del. Ch. Oct. 24, 2014) (collecting cases when a stockholder may be considered a controlling stockholder).

Plaintiff argues that Defendants' agreements with other Twitter investors should result in those investors' holdings being included in the total. With 132 million shares subject to co-investor letters, lumping in the co-investors' stock would attribute to Defendants effective control of almost 205 million shares, representing 26.8% of Twitter's outstanding shares.[101] Of course, Defendants have publicly disclaimed any beneficial ownership of the co-investors stocks, and public filings state that the co-investors have committed "to contribute to Parent, at or immediately prior to the closing of the merger . . . cash . . . to fund a portion of the Merger Consideration contemplated by the Merger Agreement,"[102] making inferences that Defendants control the stock for all purposes somewhat difficult to draw. This decision assumes—solely for the sake of analysis—that it is reasonable to impute co-investor equity to Defendants for the purpose of the control analysis. Even so,

---

[101] On April 24, 2022, Musk indicated that he was exploring having Twitter stockholders roll-over their Twitter shares for equity in post-Merger Twitter. Complaint. ¶ 19. In Amendment No. 6 to his Schedule 13D, filed with the SEC on May 5, 2022, Musk announced that he had entered into Co-Investor Equity Commitment Letters with nineteen Twitter stockholders. Twitter Inc., Amendment No. 6 to Schedule 13D (May 5, 2022). Saudi Arabia and the Qatar Investment Authority filed Schedule 13Ds as a result of their Co-Investor Equity Commitment Letters. The Co-Investor Commitment Letter of the Kingdom of Saudi Arabia alone committed to contribute 34,948,975 shares of Twitter stock to Musk's acquiring entity in order to retain an equity investment in Twitter post-Merger. The other letters contained equity commitments that could be satisfied by contributing Twitter shares held by the stockholder or cash. *Id.* at 3. At $54.20 per share, the $7.139 billion committed represented approximately 132 million shares. *Id.* The Co-Investor Equity Commitment Letters also contemplated the negotiation and execution of an Interim Investors' Agreement, an Investment Agreement, a Securities Purchase Agreement and other documents "consistent with the terms set for in Exhibit A hereto." *Id.*, Exhibit M at 1. The form of these additional agreements was not filed and Exhibit A and Exhibit B are not attached to the form of Co-Investor Equity Commitment Letter.

[102] Twitter Inc., Amendment No. 6 to Schedule 13D (May 5, 2022).

in the circumstances of this case, this level of stock ownership standing alone is not enough to give rise to an inference of control.[103] Plaintiff does not argue otherwise.

Plaintiff also urges the court to attribute to Defendants the balance of Twitter stock that Defendants will acquire if the merger closes. This defies common sense. It is true that, in some scenarios, contractual rights that have a "contingent nature" are sufficient to establish an ownership interest that factors into a control analysis.[104] In this case, however, it is illogical to factor Defendants' right to acquire stock upon the close of the merger into the analysis of whether he controls Twitter for the purpose of closing the merger.

Neither Defendants' direct stock ownership nor alleged control over co-investors' shares, alone or together, demonstrate controller status.

Second, Plaintiff points to the Merger Agreement itself as indicia and a source of transaction-specific control. Plaintiff argues that the Merger Agreement was not the result of the Twitter Board deciding that it was an opportune time to sell the Company. Rather, according to Plaintiff, "Musk insisted on a particular course of action (*i.e.*, the Merger),

---

[103] *See, e.g.*, *PNB*, 2006 WL 2403999, at *10 (noting that 33.5% ownership is "relatively low" and that "[a]t that level of ownership, a single stockholder would not be deemed a controller without additional facts supplementing his clout"); *Zlotnick v. Newell Cos.*, 1984 WL 8242, at *2 (Del. Ch. July 30, 1984) (observing that "the mere fact of 33% stock ownership, standing alone, means little").

[104] *See, e.g., Siegman v. Columbia Pictures Ent., Inc.*, 576 A.2d 625, 631–32 (Del. Ch. 1989) (finding an "Option Agreement" that had not yet been ratified by the counterparty's board of directors was sufficient to make defendant an "owner" of the shares for purposes of 8 *Del. C.* § 203(c)); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 535, 551–53 (Del. Ch. 2003) (including options in assessment of block size and concluding that option holder was a controlling stockholder); *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 913 (Del. Ch. 1999) (same at motion to dismiss stage).

30

there were indications of resistance and second thoughts by fiduciaries (*e.g.*, the Board implementing the poison pill) and Musk resorted to aggressive, threatening and disruptive behavior to get his way."[105] This argument too is a stretch. The board's adoption of a poison pill demonstrates the Board's independence from Musk, not the opposite. Musk was entitled to negotiate in his own interest.[106] And Plaintiff does not point to a single term in the Merger Agreement that Musk forced Twitter's Board to agree to against its will.

Plaintiff also argues that Defendants' contractual rights to veto Board action through ordinary-course provisions in the Merger Agreement contribute to a finding of control. Plaintiff is correct that contractual veto power over Board decisions can factor into a control analysis.[107] But Plaintiff fails to allege how Defendants wielded those rights to control Twitter or Board action with respect to the Merger Agreement here.

Neither the fact of the Merger Agreement nor Defendants' veto rights thereunder, alone or together, demonstrate controller status.

---

[105] Pl.'s Answering Br. at 48.

[106] *See In re Rouse Props., Inc., Fiduciary Litig.*, 2018 WL 1226015, at *25 (Del. Ch. Mar. 9, 2018) (finding that buyer "was entitled to negotiate the terms of the merger with only its interests in mind"); *see also Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 789 A.2d 1216, 1227 (Del. Ch. 2001) (recognizing that while a "bidder for control . . . has a fiduciary duty to its *own* investors," it has "interests that are inherently and structurally in conflict with the target company's stockholders' interest[s]") (emphasis added).

[107] *See, e.g.*, *Williamson v. Cox Commc'n, Inc.*, 2006 WL 1586375, at *5 (Del. Ch. June 5, 2006) (finding plaintiff pled minority control even though defendants never "affirmatively vetoed" any board decisions); *see also Wilmington Sav. Fund Soc'y, FSB v. Foresight Energy LLC*, 2015 WL 7889552, at *7 (Del. Ch. Dec. 4, 2015) (explaining that for purposes of determining beneficial ownership under 17 C.F.R. § 240.13d–3, "[t]he person who makes the initial decision to transfer [shares] and the person who can exercise a veto over that decision share the power to transfer, so both beneficially own the shares").

31

Third, Plaintiff cites Musk's relationship with Twitter's founder, former chief executive, significant stockholder, and director Jack Dorsey.[108] Dorsey and Musk are friends and have worked together in the past.[109] They shared the "view that Twitter would be better able to focus on execution as a private company."[110] Dorsey supported the Merger Agreement.[111] And after the Merger Agreement was announced, Musk announced that Dorsey was one of the existing Twitter stockholders with whom he was discussing a roll-over of Twitter shares into a post-Merger equity investment in Twitter.[112]

Defendants' relationship with Dorsey is a relevant factor to consider, but that relationship does not contribute much to Plaintiff's argument. Dorsey was only one of eleven Board members at the time the Merger Agreement was negotiated and signed.[113] Plaintiff does not allege that Dorsey had outsized influence over the other members of the board, or that any of the other Board members were otherwise not independent.

Defendants' relationship with a single Board member, standing alone, does demonstrate controller status.[114]

---

[108] Pl.'s Answering Br. at 50.

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] Twitter Inc., Schedule 14(a) (April 12, 2022).

[114] *See In re Vaxart, Inc. S'holder Litig.,* 2021 WL 5858696, at *17 (Del. Ch. Nov. 30, 2021) (noting that the designation of two out of eight directors did "not establish control," as "[n]either of them [was] an officer of [the Company] and neither of them [was] alleged to have taken action to exert control over [the Company's] affairs"); *see also Citron v*

Fourth, Plaintiff argues that Musk's immense wealth, celebrity status, and large Twitter following support an inference of control.[115] Plaintiff says that Musk's financial power could enable him to exert his will over a corporate board and he has shown his willingness to do so. But Plaintiff makes no allegations to suggest that Twitter's directors would be or have been swayed by Musk's unique characteristics. The ongoing parallel litigation suggests that they are not.

Musk's unique attributes, standing alone, do not demonstrate controller status.

In sum, none of the four potential sources of control identified by Plaintiff, standing alone, demonstrate controller status. The allegations are no stronger when considered together. For a "confluence of multiple sources" to give rise to an inference of control, the plaintiff must allege facts from which it can be inferred that those sources combine "in a fact-specific manner to produce a particular result."[116] Plaintiff's theory does not coalesce in any logical fashion here. Rather, Plaintiff's arguments for controller status would require the court to make multiple logical leaps, as well as ignore the reality playing out in real time.

Plaintiff has failed to allege facts from which the court can infer that Defendants were controllers of Twitter for the purpose of the Merger Agreement with concomitant

---

*Steego Corp.,* 1988 WL 94738, at *6 (Del. Ch. Sept. 9, 1988) (finding that board's allowing 48.8% stockholder to designate two of corporation's nine board members did not establish control because "[t]hat only two persons were agreed upon removes from the point much of its thrust").

[115] Pl.'s Answering Br. at 45.

[116] *Basho*, 2018 WL 3326693, at *28.

fiduciary obligations to Twitter's stockholders. Because Plaintiff has failed to allege fiduciary status, the Complaint fails to state a claim for breach of fiduciary duty.

## III. CONCLUSION

For the foregoing reasons, the portion of Count I seeking specific performance and the entirety of Count II are dismissed. The remaining aspects of Defendants' motion to dismiss Count I are held in abeyance pending supplemental briefing.